ROBERT ASHLEY SMITH *v.* STATE
OF MARYLAND

[No. 356, September Term, 1973.]

*Decided April 17, 1974.*

578

The cause was argued before THOMPSON, MOORE and LOWE, JJ.

*Regis A. Johnston* and *Norman P. Ramsey,* with whom was *Edward P. Camus, Public Defender for Prince George's County,* on the brief, for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Edmund B. O'Connell, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

On November 29, 1972, appellant, Robert Ashley Smith, nineteen, was a recent high school graduate, employed at $110 per week in a frozen food plant in Northeast Washington and living with his parents in Bowie, Prince George's County, Maryland. Early that morning, George and Lucille Brown, a middle-aged couple who resided across the street from the Smiths, died in the holocaust of their home which was discovered on fire shortly after one a.m.

Indicted thereafter for two counts of first degree murder and one count of arson, appellant was convicted of all three counts in the Circuit Court for Prince George's County, Judge Samuel W. H. Meloy presiding without a jury, and sentenced to two life terms and one term of twenty years, all to run consecutively.

580

Appellant contends that the lower court erred in (a) receiving in evidence, after hearings on his motion to suppress, inculpatory statements given to a three-member police team during the early morning hours of November 30, 1972, and (b) in failing to limit the admissibility of a detective's handwritten notes previously offered and received as a defense exhibit, so as to exclude the result of a polygraph test requested by appellant while in custody. A third ground of alleged error, seriously pressed, is that the State failed to establish, as the cause of the conflagration, the pouring of a flammable liquid (gasoline) along the front of the house and thus failed to establish the *corpus delicti* and criminal agency on the part of the appellant, in the face of expert testimony adduced by appellant that the fire had two independent natural origins, (1) defective electrical wiring in the area near the front door of the house and (2) a separate burning in the living room of the house, near the sofa, allegedly caused by a cigarette.

For the reasons set out below, we reject these assignments of error and conclude that the judgment and sentence of the lower court must be affirmed.

I

The inculpatory statements assailed as improperly received consist of appellant's handwritten statement, questions asked him by the detective in charge, Mr. Crump, and appellant's answers — all in Crump's handwriting but signed by appellant — and oral statements made by appellant to each of the three detectives during the course of interrogation. As will appear, these statements are a curious *melange* of the hypothetical and assertorical, of direct incriminatory admission and oblique conjecture as to acts appellant "could have" or "might have" committed. Taken as a whole, however, there can be no question, in our view, that they are inculpatory, "in the nature of [a confession]," *Markley v. State*, 173 Md. 309, 314, 196 A. 95 (1938), and that their admissibility, therefore, was subject to the requirement of constitutional voluntariness.[1]

---

1. For purposes of admissibility Maryland cases join "the modern view"

The bases for the alleged error in admitting the statements are that the *Miranda* warnings were inadequate and ineffective, that appellant was denied his right to counsel during the custodial interrogation, and that the statements were not given freely and voluntarily.

Mr. Smith's handwritten statement read as follows:

"All I can remember was that I went home about 1:00 a.m. and went too sleep. The next thing I remember was my alarm going off and it being 5:30 a.m. so I got up to go to work.

"Now what I think might have happened was that I got up shortly after I went to bed and went outside. From there I could have gone across the street to the Brown's home and entered the garage. Where I found some gasoline, I then poured it on the house and set it aflame. Thinking that it was a pile of wood and that it was cold outside. After this I might have gone for a walk, to what place; I don't know. I might have turned around after awild and I must have seen the flames much higher than I expected. From that point on I was scared so the best thing for me was to head on home; and this is the way that I thought it was. (As in the original.)

The questions and answers signed by him are as follows:

"Q. How would the fire have started?
A. Gasoline.
Q. Where did the gasoline come from?
A. Possibly Mr. Brown's garage.
Q. What type of container is it in?
A. Red gas can, most gas cans are red.
Q. Where did you put the gas?
A. On the house, outside wall, front.

---

(III *Wigmore on Evidence*, § 821 [Chadbourn Revision]) and recognize no distinction between a custodial "admission which is significantly incriminatory but short of a confession," and a confession. Stewart v. State, 232 Md. 318, 193 A. 2d 40 (1963). Miranda, of course, is applicable in either situation.

Q. Where would you put the gas can after the fire started?

A. The logical thing is just to get rid of it.

Q. Why would you have started the fire?

A. To scare them.

Q. Did you intend for the Browns to be killed?

A. No.

Q. Was the death of the Browns only an accident?

A. Yes.

Q. Does Matsie, Rex, or Marc have any direct knowledge of the fire or deaths?

A. No, not to my knowledge.

Q. Have you told anyone, except for the police, about the fire?

A. No. The real reason I started the fire was because I hated the clinging Rose Vine on the left side of the front porch. I had ran into it a couple of times during the last summer.

Q. What kind of gasoline?

A. Shell regular.

Q. Why Shell regular?

A. Because I used to work for Shell Oil Co. and its the cheapest gas.

Q. What area of the house caught fire?

A. The porch, front door.

Q. How was the fire ignited?

A. Match, after trail of gasoline was laid down.

Q. When you talked to your parents did you tell them this?

A. No.

Q. Have you been forced, threatened or promised anything to give this statement?

A. No.

Robt A Smith."

Appellant's contentions with respect to alleged error in receiving these statements, as well as oral statements testified to by the detectives, were assayed twice: first, in a

pretrial suppression hearing before Judge Ernest A. Loveless, Jr. and thereafter in a hearing *de novo* during the trial granted by Judge Meloy under Md. Rule 729 g 2.[2]

The pertinent evidence upon the motions to suppress could be found from the record to be substantially as follows:

After the fire at the Browns' residence was brought under control and the bodies removed, County homicide detectives conducted a neighborhood investigation in the course of which they called at appellant's home at about 5 a.m. on November 29, 1972. He was in the process of dressing for work and granted the detectives full permission to look around.

Mr. Donald Beach, through whom he had obtained his employment about two and one-half weeks before and with whom he had been commuting to work, picked him up at about 6:15 a.m. He worked from 6:45 a.m. to about 2:30 p.m. At about 9:30 p.m. five detectives appeared at his door. Appellant admitted them and permitted them again to inspect the premises, including the outside garage. His parents were away on a trip to Williamsburg, Virginia.

The detectives asked him to come to the police station to make out a statement and he agreed, "just to be a good citizen; to cooperate with the police."

At the station, he was left alone in a small interrogation room from 10 p.m. until approximately 10:30 p.m. when Detective Crump read him the *Miranda* warnings from a small card. In addition, appellant signified his willingness to make a statement on a printed form containing the *Miranda* warnings and signed his name to a "Waiver of Rights" appended thereto.

---

2. In an oral opinion, rendered after hearing extensive oral argument approximately one week after the taking of testimony on the motion, Judge Loveless rejected the contentions of appellant, finding difficulty only with appellant's claim that he had been denied his right to counsel. As to this, Judge Loveless held that appellant had not, in effect, requested an attorney. See p. 10, *infra*. Judge Meloy first made a brief but formal finding that the motion to suppress be denied and that "the statements and/or admissions were voluntarily made." Thereupon, in his oral opinion at the conclusion of the case, he detailed his reasons for the affirmative finding of voluntariness.

Appellant was interrogated in turn by Detectives Crump, Nelson and Hatfield. He was left alone between interviews for intervals of time up to 35 minutes, during which he relaxed and smoked or slept. He was permitted to use the telephone once upon his request and to use the men's room as needed. He was also given "cokes" and crackers. Detective Crump was the first to interrogate him and appellant, in his testimony, did not complain of Crump's attitude or questioning. Detective Nelson, appellant testified, however, "came in kind of loud" and acted "like he was unafraid of anybody." Appellant did not like his attitude and "just refused to really cooperate with him." The demeanor and approach of Detective Hatfield, he testified, was different: "Very soft, yet sure-footed." Appellant was comfortable with him at first but became disturbed later because Hatfield had "one knee ... between both my knees and he was leaning forward talking to me. Then he would move up a little bit each time." Appellant got up and walked around the room but, he said, the Detective moved up on him again when he resumed his seat.

Eventually, appellant was given paper and pencil by Detective Crump and began to write out a statement. Prior to this, he had told Crump and the other officers that he did not burn the Browns' house but knew how it "could have" been done, with gasoline; also, that he "might have" done it. Appellant testified that, prior to writing the statement, he asked Detective Crump if he could have a lawyer and that the detective responded: "Yes, but we don't have one standing out by the front door." The detectives, in their testimony, stated that appellant did not request an attorney at any time during the interrogation. Detective Nelson testified that appellant never requested permission to go home:

> "No, sir; quite the contrary. Mr. Smith wanted to stay. He kept saying he didn't know whether he did it or not and he wanted to prove to himself if he — he wanted to find out for himself if he lit the fire. He requested a polygraph examination."

Appellant began preparing his statement, according to the

detectives, at "0300 hours" on November 30 and completed it an hour to an hour and one-half later. Appellant, on the other hand, stated that it seemed "more like 8:00 or 9:00 o'clock in the morning," [2a] and appellant's counsel argued to the court that Detective Crump's notes, received in evidence, originally revealed "0900" as the time appellant began his written statement and that the numeral "9" had been changed to "3."

The specific points raised by appellant in the context of the circumstances above outlined are (1) that the *Miranda* warnings were administered only once during a period of extended interrogation by three officers; (2) that his request for an attorney was ignored; (3) that his statement was obtained by the use of improper psychological devices and (4) that his will was overborne because of the length and nature of the interrogation and because of lack of sleep for a period exceeding 24 hours.

In reviewing the admissibility of a confession or other inculpatory statement, this Court has consistently recognized its obligation to make an independent review of the record. Thus, in *Dennis v. Warden*, 6 Md. App. 295, 251 A. 2d 909 (1969), Chief Judge Orth stated, at 315:

> "While the general rule is that the determination of admissibility of a confession is left largely to the trial court, and will not be disturbed unless there is a manifest abuse of discretion, *Cooper v. State*, 1 Md. App. 190, it is our duty on review to examine the entire record and make an independent determination of the ultimate issue of voluntariness. *Davis v. North Carolina, supra*, at 741-742. As is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict here in the testimony as to the events surrounding the interrogations. But we are not a finder of facts; the

---

**2a.** This was at the *de novo* hearing; in the pretrial hearing before Judge Loveless, however, appellant said on cross-examination: "It was early in the morning, I imagine roughly about 4:30, 5:30."

> weight to be given evidence and the credibility of witnesses are matters for the lower court."

And in *Walker v. State*, 12 Md. App. 684, 280 A. 2d 260 (1971), Judge Moylan expounded the concept of independent appellate review in the following language, at 695:

> "What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact — the existence or non-existence of voluntariness."

With respect to the first contention, we find no support on the facts presented nor under the decided cases for the proposition that the *Miranda* warnings should have been renewed. The trial court could properly accept the detectives' version of the facts relating to the elapsed time between the administration of the warnings at 10:30 p.m. and the commencement of the preparation of the statement at 3:00 a.m. — a total of approximately $4^1/2$ hours. During this time, appellant was not removed from the original place of interrogation nor were the identities of the interrogators changed. The situation is quite unlike that presented in *Franklin v. State*, 6 Md. App. 572, 252 A. 2d 487 (1969), upon which appellant relies, where the *Miranda* warnings were first administered on September 4 and the appellant was subjected to further custodial interrogation on the two following days without being afforded again the requisite warnings and without an effective waiver of his rights having been secured. And in *Brown v. State*, 6 Md. App. 564, 252 A. 2d 272 (1969), upon which reliance is also placed, the

appellant was warned of his *Miranda* rights on a Sunday night at Deer Park in Garrett County where he was interrogated, and the following day he was driven to a State Police barracks 50 miles distant for further interrogation by another police officer, a lie detector expert, who did not give the warnings. This Court, in an opinion by Judge Thompson, reversed the judgment of conviction, but the following language concerning the necessity *vel non* for renewal of *Miranda* warnings in custodial interrogations, is strikingly apposite:

> "We quite agree with the cases which hold that the *Miranda* warnings need not be given anew nor the *Miranda* waiver expressed each time the officers question an accused. See particularly *State v. Davis*, 157 N.W.2d 907 (Iowa 1968); *People v. Long*, 69 Cal. Rptr. 698 (1968); *Sossamon v. State*, 245 Ark. 302, 432 S.W.2d 469 (1968); *Miller v. United States*, 396 F. 2d 492 (8th Cir. 1968). The thread running through these cases, however, shows that both interrogations were conducted by the same officer, in the same place, or were close together in point of time, or the statement at the subsequent interrogation was substantially the same as at the earlier interrogation." p. 569.

We hold that the circumstances in the instant case do not support the contention that the *Miranda* warnings should have been re-administered.

Appellant next contends that during the course of his interrogation he requested an attorney and that Detective Crump denied him that constitutional right by responding: ". . . we do not have one standing outside the door. . . ." In his oral opinion denying the pretrial motion to suppress Judge Loveless expressed concern with this contention and made the following finding with respect to it:

> "I do have some concern, however, on the question of his inquiry concerning, 'Is there an attorney available,' or, 'Where is one,' and the

statement was made that, 'Well, we don't have one outside the door.' Again I have to look at the totality of the entire situation with the warnings that had been given, and with the statements that were signed. I can only conclude from the individual's person, his education and his apparent understanding, that he understood that he could stop, that he didn't have to continue, and that this was not in effect a request that 'I do want an attorney.' "

We note that Detective Crump, in his testimony before Judge Loveless, denied on direct examination that appellant had requested an attorney and, on cross-examination, testified that the statement was not made that: "Well, we don't have them (attorneys) standing around outside the door." If the implication of the above excerpt from the opinion of Judge Loveless is that he accepted appellant's version of what was stated by himself and Detective Crump, respectively, we would find ourselves in sharp disagreement with the conclusion that appellant was not denied his right to counsel. The Supreme Court in *Miranda* provides no escape from its mandate that interrogation shall cease when the accused "indicates *in any manner* and *at any stage* of the process that he wishes to consult with an attorney," (emphasis added); and, as Chief Justice Warren explained: "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." 384 U. S. 444-45. *See also, Nasiriddin v. State*, 16 Md. App. 479, 498, 298 A. 2d 490 (1973).

Here, however, there was a hearing *de novo* during the trial of the case. Detective Crump again denied that appellant at any time requested an attorney and his notes, received as a defense exhibit, also contained an entry: "Did not request counsel." Detective Hatfield, when interrogated on the point, also testified that no request for an attorney was made of him by appellant. The latter's testimony in the *de*

*novo* hearing before the trial judge on the motion to suppress was as follows:

"Q Was there any talk between you and him about a lawyer?

A No.

Q In the second interview with Detective Crump, was there any talk about a lawyer?

A I believe there was.

Q What was that?

A I asked him something to the effect, 'Could I have a lawyer come in and talk to me about this before I answer any more questions?' He said, 'Yes, but we don't have one standing out by the front door.' "

The trial judge made no formal findings of fact nor did he issue an opinion at the conclusion of the hearing *de novo*. It was not incumbent upon him to do so, then or later. *Sims v. Georgia*, 385 U. S. 538 (1967). As the Supreme Court also held in *Sims*, it is required that the trial court's finding of voluntariness "appear from the record with unmistakable clarity." 385 U. S. at 544. *See Murphy v. State*, 8 Md. App. 430, 260 A. 2d 357 (1970). Here, Judge Meloy made an express finding of voluntariness at the end of the *de novo* hearing which fully conformed to that standard. Moreover, as previously indicated (footnote 2, *supra*), in stating his findings and conclusions from the bench at the close of the case he expounded the reasons for his determination of voluntariness in the *de novo* hearing, at some length. He did not specifically advert to the question of whether or not there had been a request by an appellant for an attorney. Implicit, however, in his denial of the motion to suppress is a finding that the conflict in the testimony of the accused and the detectives was resolved in favor of the latters' version. The trial judge's consideration of such a motion necessarily involves the resolution of disputed facts and issues of credibility upon which the questions of voluntariness and protection of constitutional rights depend. *Jackson v. Denno*, 378 U. S. 368 (1964). The weight to be given evidence and the

credibility of witnesses are matters for the lower court. *Gibson v. State,* 4 Md. App. 222, 242 A. 2d 204 (1968).

Accordingly, we conclude that appellant's claim of a denial of his constitutional right to counsel during the interrogation is without merit.

We must also reject the contention that the trial court should have granted the motion to suppress because of "patent psychological ploys," [3] as suggested by appellant. In our independent review of the entire record, we find no error in the findings below that the so-called "Mutt and Jeff" routine had not been employed by the detectives nor that any improper physical coercion was exercised by Detective Nelson. Even if the approach and demeanor of each of the three interrogating officers had been found by the lower court to have been deliberately different and simulated, the ultimate test of any alleged impropriety in this type of interrogation is, of course, its effect upon the accused. Here, the claimed truculence of Detective Nelson did not place appellant in fear. According to appellant's own testimony he told Nelson "where to go" and "refused to cooperate." As for the alleged closeness of the detective to the accused in the interrogation room and the alleged technique of inserting his knee between those of appellant (claims denied by the detective), there is again no evidence to sustain counsel's argument that "fear and emotional distress in the mind of the defendant" resulted. The factual situations in *Walker, supra,* and *Dennis, supra,* upon which appellant relies, bear little resemblance to the facts here and these cases do not, in any event, reach the question of impropriety *vel non* in the use of psychological techniques. Here, the appellant himself, in response to a question by the trial judge, stated that he could not "pinpoint" any improper influence upon him by his interrogators.

A conflict exists in the testimony of appellant and that of the third detective, Mr. Hatfield, on the question of whether or not the detective had urged him to "cop to a lesser charge." The detective denied any such statement but

---

3. Miranda, *supra,* at 457.

admitted advising appellant that if his version of the occurrence as an accident was acceptable to the State's Attorney, the court "may take that into consideration." He also denied having informed appellant that if he told the truth he would be permitted to go home and/or that he would not have to cope with Detective Nelson. Again, the resolution of this conflict in the testimony was for the lower court. Maryland case law applicable in the area of prohibited inducement was succinctly stated by this Court in *Hargis v. Warden*, 3 Md. App. 76, 80, 237 A. 2d 807 (1968), footnote 2:

> "Maryland has held that an inducement to the effect that a confession would 'help' a defendant is sufficient to make a subsequent statement involuntary under certain circumstances. *Lubinski v. State*, 180 Md. 1. Maryland has also held that a statement by the authorities to the defendant that it would be 'better' for him to confess may make a subsequent statement inadmissible. *Biscoe v. State*, 67 Md. 6; *Watts v. State*, 99 Md. 30; *Dobbs v. State*, 148 Md. 34 at 60, 61 (concurring opinion); *Edwards v. State*, 194 Md. 387; but cf. *Ralph v. State*, 226 Md. 480. But cases have also said that a mere exhortation to tell the truth would not amount to a prohibited inducement. *Deems v. State*, 127 Md. 624; *Kier v. State*, 213 Md. 556; *Merchant v. State*, 217 Md. 61; *Burke v. Warden*, 239 Md. 701."

Urging an accused, during the course of custodial interrogation, to "cop to a lesser charge" clearly would be prohibited, but it is apparent that the question of credibility was here resolved against the accused. Similarly, to inform the accused that he would be released if he told the truth would be improper if the circumstances disclosed that the accused was influenced thereby. Here, the appellant evinced no desire to leave. Indeed, as the trial court pointed out, by his own testimony appellant felt free to leave at any time.

The statement which the detective admitted making, namely, that the court might take into consideration a version by the accused of the fire being accidental, does not

bear the benchmark of prohibited inducement. The test, at all events, is whether the confession or other inculpatory statement was procured under the hope of favor or advantage if made, or fear of harm or disadvantage if withheld. *Biscoe v. State, supra.* As the Court of Appeals pointed out in *Biscoe,* in determining the force of any influence used and its effect upon the person in custody, "much, very much . . . depends upon the age, the experience, the intelligence and character of the prisoner." Here, the accused was youthful. He had, however, completed his secondary education and was responsibly employed. The court described him as "composed, articulate, erudite and sophisticated." Upon our independent review of the record, we do not find that his inculpatory statements were the product of any improper influence by Detective Hatfield on the specific grounds advanced, nor on any other basis.

Finally, appellant's omnibus charge that his statements were not made freely and voluntarily must be measured by whether, under all the circumstances, they were "the product of a free and unconstrained will which had not been overborne or compelled." *Robinson v. State,* 3 Md. 666, 672, 240 A. 2d 638 (1968); *Dennis, supra; Walker, supra.*

In this case, there was evidence which was sufficient to establish that the full panoply of *Miranda* warnings was administered, that appellant had not requested counsel prior to or during the interrogation, that he was not denied the use of the telephone, that he was afforded beverage and crackers, that although he had been without sleep since 5 a.m. on November 29 until approximately 4 a.m. on November 30 when his statement was completed, he nevertheless had dozed and slept for short periods during interruptions in the interrogations; that he was in normally good health, a 19 year old high school graduate of average intelligence, gainfully employed, that he wrote his own statement and signed the questions and answers written by Detective Crump, that he was not physically restrained or prevented from returning to his home and stated twice that he did not want to go home until he found out if he had done it or not, that he himself hypothesized not only how the

crime might have been committed but also how he himself might have perpetrated it before he was given writing materials to compose a statement; and in response to a question by the trial court, testified that he could not "pinpoint" any improper influence upon him by his interrogators.

In this factual context, our examination of the entire record leads us to the conclusion that the statements were not the product of a will overborne. We find no coercion from any practice by the police which had the effect of controlling appellant's will. The statements were voluntarily given.[4]

## II

Appellant's next contention is that the trial court committed prejudicial error in not excluding that portion of a defense exhibit which referred to the results of appellant's polygraph test.

Our examination of the record discloses that the first reference to a polygraph test came on direct examination of Detective Nelson, on the second day of trial, as follows:

"Q Who brought up the subject of the polygraph?

MR. JOHNSTON: I will object to anything about the polygraph. It is not relevant or admissible.

THE COURT: I agree the finding would be inadmissible. But I will overrule the objection as to the question.

THE WITNESS: Mr. Smith.

BY Mr. O'Connell:

Q Was he offered one? After he brought the subject up?

A Yes, sir.

Q Was one actually given to him?

A Yes, sir.

\* \* \*

---

**4.** United States Supreme Court cases presenting fact situations held to constitute involuntariness were collated by Chief Judge Orth in his opinion in *Dennis, supra,* at 316-319.

Q Approximately what time?

A It would be in the morning, approximately, I guess, around 6 o'clock, 6:00 a.m.

Q That would have been after his statement was completed?

A That is right."

The trial court's observation concerning the inadmissibility in Maryland of the results of "lie detector" tests was, of course, correct. *Rawlings v. State,* 7 Md. App. 611, 256 A. 2d 704 (1969).

Detective Nelson was followed to the stand by Detective Hatfield. When the latter's testimony was completed, the court announced that the *de novo* hearing, on the renewed motion to suppress, would proceed. Defense counsel thereupon called the appellant, followed by a psychiatrist and appellant's father. At the conclusion of their testimony and before resting on the motion, defense counsel announced to the court that defendant was offering — and the State did not object — Detective Crump's notes of his interrogation of appellant consisting of 2 pieces of yellow paper with handwriting on the front and reverse sides. The exhibit, marked as defendant's No. 5, was received in evidence.

The court experienced difficulty in reading the detective's handwriting and requested counsel to read it. Then, for the first time, counsel indicated that the purpose of the exhibit was to dispute Detective Crump's testimony as to the time when appellant's written statement was made.[5]

In response to the court's direction to read the exhibit, counsel requested permission to approach the bench and th following colloquy occurred:

"MR. DIGMAN: Your Honor, the purpose of introducing this is for Crump's time that he has on here. There are things that he had written on the back of this thing.

---

5. As stated earlier, Detective Crump testified that appellant began writing at 0300. Appellant's position is that the time originally entered in the statement was 0900 and that the "9" had been changed to a "3."

THE COURT: You introduced the whole thing. The Court has got to consider it.

MR. JOHNSTON: There is no other way I can do it. It is very, the time element is extremely important.

THE COURT: I understand that, Mr. Johnston, but I, as trier of the facts and interpreter of the evidence, I have to know exactly what it says. I ask you to read it into the record, sir.

MR. JOHNSTON: That is the problem. If I read it here, to me that is 900 hours."

Thereupon, co-counsel read the entire exhibit, without making any objection, including this: [6]

"He followed up by asking for polygraph ... which was run at 9:45 a.m. The test showed deceit."

It is clear that counsel originally offered the entire document and, after it was received, made no request on the record that any portion of the exhibit be withdrawn; nor was any formal objection made to the court's instruction that it be read; nor was there any more specific explanation to the court of the contents of the notes belatedly deemed exceptionable than counsel's statement at the bench: "There are things on that back that are the same as the statement itself."

We are persuaded by our review of the proceedings that the contention that the court committed prejudicial error cannot be sustained because (a) the exhibit was offered in evidence by defense counsel and received, without any prior disclosure to the court by counsel that it was being offered for a limited purpose; and (b) no objection nor motion for a mistrial or other appropriate relief was made below so as to preserve the question for appellate review. Rule 1085. Furthermore, the trial judge earlier had explicitly stated that the polygraph test results would not be admissible, and there is nothing to indicate that he considered the results as

---

6. The court subsequently recalled Detective Crump for the purpose of reading the exhibit. At that time, there was no further interrogation by counsel.

disclosed in the detective's notes when he analyzed the facts and law at the close of the case, prior to announcing appellant's guilt. In our judgment, it is proper to conclude in this case that the trial judge ignored the incompetent evidence. *State v. Hutchinson*, 260 Md. 227, 271 A. 2d 641 (1970); McCormick, *Law of Evidence* (1972), p. 137.

## III

The final contention of the appellant is that the trial court was clearly erroneous in its determination of appellant's guilt because the evidence against him was "strictly circumstantial" and insufficient to support a conviction.

Appellant argues, as the test of sufficiency where circumstantial evidence is involved, that the circumstances "taken together must be inconsistent with or such as to exclude every reasonable hypothesis or theory of innocence." In *Metz v. State*, 9 Md. App. 15, 262 A. 2d 331 (1970), Judge Orth, writing for the Court, pointed out that the employment of the quoted language is merely to paraphrase, in practical application, the statement that the evidence must show the facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. He stated: "In short, we feel that the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom."

The test as to the sufficiency of evidence in a criminal case, succinctly stated in *Metz*, is as follows (p. 23):

> "To be sufficient in law to justify a conviction, the admissible evidence adduced must show directly, or circumstantially, or support a rational inference of, the facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

In a prosecution for arson as in other criminal cases, the State must prove the *corpus delicti, viz.*, burning with a criminal design. Not only must the fact of the fire be shown;

it must also be established that it was willfully and maliciously set. The State must prove a criminal design beyond a reasonable doubt. Proof of the defendant's criminal agency, although essential for conviction, is not part of the *corpus delicti. Davis v. State,* 202 Md. 463, 97 A. 2d 303 (1953); *Bollinger v. State,* 208 Md. 298, 117 A. 2d 913 (1955); *McDowell v. State,* 231 Md. 205, 189 A. 2d 611 (1963); *Hughes v. State,* 6 Md. App. 389, 251 A. 2d 373 (1969). Other relevant rules of law in arson cases that may be encapsulated from the cases cited and their underlying authorities are these:

1. The character of the evidence to prove the *corpus delicti,* and its sufficiency for that purpose, depend largely upon the circumstances of each particular case; and the law recognizes that since a burning is almost invariably clandestine, the prosecution must usually depend upon circumstantial evidence.

2. An extrajudicial confession of guilt of arson uncorroborated by other evidence of the *corpus delicti* is not sufficient to warrant a conviction.

3. With respect to the nature and quantum of the evidence needed to corroborate the extrajudicial confession:

   (a) Such evidence need not be full and positive, and may be circumstantial in nature when direct evidence is not available.

   (b) It need not establish by itself the truth of the *corpus delicti* beyond a reasonable doubt or by a preponderance of proof.

   (c) Any facts and circumstances that are substantial in nature and fortify the truth of the confession or statement are sufficient.

In the instant case, there was no direct independent evidence of the *corpus delicti.* Expert testimony adduced on behalf of the State and of the appellant was in sharp conflict as to an incendiary origin of the fire which destroyed the Browns' home and claimed their lives.

The facts before the trial judge included the following: Appellant lived in a house with his parents across the street from Mr. and Mrs. Brown on Starlight Lane in Bowie,

Maryland. The Smiths were perhaps the best friends of the Browns in the neighborhood and played bridge with them rather regularly. On such occasions at the Smith residence, Mr. Brown requested that no alcoholic beverages be offered because Mrs. Brown had a drinking problem. Mrs. Smith had made a gift to Mrs. Brown of a rosebush which was planted on the front lawn to the right of the house.[7]

Appellant had a good relationship with Mr. Brown, who was going to teach him to be a locksmith. The young man had little contact with Mrs. Brown. He remembered having given her a ride on one occasion and having driven her car to be waxed, but there was little else. He graduated from high school in June of 1972 and Mr. Donald Beach, a neighbor who testified in his behalf, had helped him get a job in a frozen food plant in northeast Washington. Appellant had started to work some $2^1/2$ weeks prior to November 29, 1972. Mr. Beach had been giving him a ride to and from work.

During the last week of November, 1972, appellant's mother and father made a visit to Williamsburg, Virginia. They were away on Tuesday, November 28th. That evening appellant spent some time at home with three male friends. They had a beer and talked and, after midnight, went to the back entrance of Fort Meade to find a place to "junk" the body of an automobile one of them had purchased for its engine. The group returned to appellant's home at about one o'clock a.m. on Wednesday, November 29th, and dropped him off. He told them he was tired and was going to go to bed.

Some time after one o'clock and before one-thirty, Mr. George Monroe who lived next-door to the Smiths and across the street from the Browns, observed a fire around the door of the Browns' house as he was returning from the bathroom to his bedroom. He could not place the exact time. Excited, he donned his bathrobe and rushed outside. As to what he observed, Mr. Monroe testified:

---

7. This was the rosebush to which appellant referred in the statements attributed to him by the detectives, quoted *infra*, p. 27.

"... I observed not only the flames around the exterior front door, but also a glow from what would be the southeast corner of the living room. And from there I pounded on their house. I should state there was a pall of smoke hanging over the structure which would remind you of a dirigible. There was very little wind that evening."

Under questioning, Mr. Monroe testified that the fire at the door was "at the top, the sides and the bottom." To a question by the court, he responded that the second fire in the southeast corner of the living room was 25 to 30 feet from the door.

Both he and his wife aroused other neighbors, one of whom called the fire department. The fire was brought under control before 2 a.m. and Mr. Monroe was present when the bodies of George and Lucille Brown were brought out.[8]

The observations of other neighbors are contained in the record. Mr. Daniel McCarthy, a next-door neighbor of the Browns, said:

"... the fire that I observed (when he first observed it from his bedroom window upstairs) was confined to the downstairs in the house and it would be the lower southeast corner. The room was totally engulfed in flames. When I went outside, looking at the house from the front, there was a small amount of fire around, in and about near the front door with the flames coming up through the porch where the porch roof joins the main portion of the house, so to speak."

The time, he testified, was 1:15 a.m. or a little later.

On the Browns' side of the street, their next-door neighbor, Mrs. Elaine Kincheloe, was awakened by her dog at 1:30 a.m. ("I looked at my clock") and, upon looking out,

---

8. The autopsy report gave as the cause of death "carbon monoxide poisoning due to: Conflagration."

saw "a very reddish-orange glow by the front door, which would be to the right of the front door."

Mr. Carl Haynes, a next-door neighbor of the Smiths (and a witness for the defense) also stated that when he heard the fire engines and first looked out, "the door was where the fire was; it was in and around the door" and he thought it was "a fire from the light on the porch." Other defense witnesses, Mr. and Mrs. Donald Beach, however, saw no flames at the door; nor did Mr. Beach see any flames at the left or right sides of the house. There was, of course, considerable commotion and noise generated by the emergency vehicles at the scene, including the water pump, and by firefighting personnel and excited neighbors. The appellant claimed to have slept through the noise and excitement. A housewife three houses down from the Browns, testifying for the defense, said that she also slept through "the entire thing" as did the children of Mr. and Mrs. McCarthy and the son of Mr. Haynes. The appellant had lights on in the living room and dining room as well as in the garage, a usual practice, it was testified, when his parents were away.

A neighbor, anxious to obtain the telephone number of the Browns' daughter, first "beat very hard" on the side of the Smith house shouting, "Robby [appellant], wake up. This is Elaine. The Browns' house is on fire." She "banged very hard" and, apprehensive that he would not hear, she "banged on the window." There was no response from within the house. On behalf of appellant, it was testified by both his parents and by Mr. Donald Beach that he was a heavy sleeper and it was difficult to arouse him.

Mr. Beach stopped by appellant's home a little after 6 a.m. on the morning of the fire to give appellant a ride to work. Appellant, he said, was "very dejected" and "emotionally touched" when Mr. Beach informed him that the Browns had died in the fire. Tired and distressed, Mr. Beach left his own work between 2 and 3 p.m. He picked up appellant who apparently had also obtained permission to leave earlier than usual. According to appellant, he had no supper that

evening and was alone until the police came again at 9:30 p.m.

On the morning of November 30th, a two gallon gasoline can was found 4 feet inside the Browns' garage, the doors of which had been open, with the cap missing and some gasoline still in it. No fingerprints were found on the container. Laboratory tests of materials taken by the fire marshal from the Brown home showed exposure to no flammable liquid.

Appellant's handwritten statement, *supra*, recited:

> ". . . I could have gone across the street to the Browns' home and entered the garage. Where I found some gasoline, I then poured it on the house and set it aflame."

The conversations which appellant had with the three detectives as to his possible participation in the setting of the fire were thus described:

*Detective Crump:*

> "A The exact words, I don't remember. I asked him questions concerning the fire, why he started the fire. The answers were in a form of 'I believe,' or 'I might have,' or 'may have,' or 'If I was going to do it, I would have done it this way.' He stated that originally he thought he left the house, he thought the Browns' residence was a large pile of wood, he was cold and he started the fire and the fire got larger than he thought it would have gotten."

*Detective Nelson:*

> "A Mr. Smith stated, 'I don't think so, but I may have.' I asked him to explain that. He stated that he was asleep or he thought he was asleep. 'I don't know what I do when I sleep.' And I asked him to explain that. And he went on and he told me at one point that he thought he remembered dreaming, thought he was

walking down the street and it might have been cold and he might have thought the Brown's house was a pile of wood and he might have poured gas on it to keep warm.

\* \* \*

Then he went on to tell me another version, that something about a rose bush, that he didn't like the rose bush, might have been trying to burn the rose bush down. But he never really — he seemed to be theorizing this. He could have did it; he might have did it; I don't know."

*Detective Hatfield:*

"A   Okay. I asked him if he had any knowledge with reference to the house fire and he stated that he didn't. So then I began talking to him about it again and then he kept saying that he didn't know if he had set the fire or not. And then he kept saying maybe he had a nightmare and was walking in his sleep and he was cold and he thought the house was a pile of lumber and if you pour some gasoline on the house. And then when he woke up, it was too late to do anything about it and he got scared and he ran and he got to the point where he says 'I don't know if I set the fire or not.' He kept saying that he wasn't sure himself whether or not he was involved in it. And I asked him if he could remember anything like how it started or anything like this. He said no, but he bet that whenever we found out how it happened it was probably set with a low octane gasoline like a Texaco or Mobil low-lead gasoline that has a 94 octane level. He said, 'Therefore, it doesn't contain sulfate and doesn't leave a residue.' And I kept questioning him about his knowl-

edge in reference to gasoline, com-
bustibles and like this, and he said he just
knew about things like that. I asked him if he
set the fire and he says, 'No.' Then he says, 'I
really don't know. I don't think so. Maybe I did.
Maybe I didn't. I don't know. I really can't say.'
Then he started telling me suppose this
happened, and suppose, you know, the house
was logs and suppose it was an accident and
just things like that. And started more or less
going on the basis of could be or couldn't be."

The conversation between appellant and his father at the
police station on the afternoon of November 30th in the
presence of detectives was thus related by Detective Crump:

"A   His father, when he first came in the room,
asked him if he wanted to tell him anything.
The defendant stated, 'I did it.' His father said,
'What?' And he said, 'I killed the Browns.' Mr.
Smith then asked his son was he sure. He
stated something, 'Well, I don't know. Four
hours ago I was sure; now I am not.' He further
stated he didn't want an attorney."

The version of the father-son confrontation given by the
father on direct examination was different. He testified:

"A   Yes. I don't recall the details, but he said hello
to me and he mumbled something that I didn't
understand. And then I asked him, 'Did you do
this': And then he spoke up loud and clear so I
and Detective Crump both heard him very
well. He said, 'I did not do it. Up until about
four hours ago I was sure of this; now I don't
know what I did.' "

On the issue of causation of the fire, the State adduced the
testimony of the Supervisor, Fire Investigation Section, of
the Fire Marshal's office in Prince George's County, acting
Captain James Isaac Mundy. In addition to his educational
background, Mr. Mundy's experience qualifications included

fire inspection work beginning in 1963. He testified that he had investigated "approximately 1000 fires as to their cause," approximately 30 of which involved loss of life. It was Captain Mundy's expert opinion that there were two points of origin of the fire: one at the base of the front door to the residence and the second approximately 10 feet to the right of the door, beneath and to the left of the dining room window. Both fires burned vertically, the latter diagonally, and jointed to "bank" above the door and produce intense burning there. It was his finding that the fire was started at the exterior of the building by the use of a flammable liquid and that a transmission of heat to the interior occurred, resulting in a fire in the living room at the area of the couch and end tables, the couch being manufactured of combustible material. The transmission of heat to the interior was the result of what he termed a "flash-over," which he defined as a condition "which we have come to know more frequently with carpet." He further described it as follows:

> "... It comes from a heating of an area, particularly when you have a type substance which will develop a nap where you get an instantaneous and extremely rapid flame spread across a surface. Area. This will occur whether the material is horizontal or vertical; an extremely rapid flame spread."

There also resulted the spread of heated and toxic gas (carbon monoxide) to the upper areas of the building, including the two bedrooms in which the bodies were found. Captain Mundy's inspection of the fire occurred between 2:30 a.m. and 3:00 a.m. on the morning of the fire. He took a number of pictures which were later processed into slides.[9] Certain of these pictures included the base of the front door depicting, in his words, "intense localization burning." This, in his opinion, would allow the heat of the fire to be

---

9. These slides were received in evidence and exhibited at the trial. The slides have also been projected and carefully examined in connection with our appellate review.

transmitted beneath the door, from where the wall-to-wall carpeting directly against the door caused a "flash-over" extending into the living room. The witness discounted the presence of a low voltage electric line to a light just inside the front door. He had failed, he conceded, to note the presence of a so-called romex cable above the door entrance. He denied that it was possible that the door could have been burned when it was opened forcibly by the firefighters.

Mr. Mundy's ultimate conclusion was that the building "sustained two separate fires which were set. All natural sources or causes of ignition were eliminated."

Against the expert testimony of the State, the defense presented three technical witnesses, the first a private investigator, L. Ben Guiffre, who investigated the scene approximately one month after the fire. From his visual observations this witness testified that the greatest area of damage was above the front door to the house and also in the living room, especially where the couch and end tables were located. He identified a pair of women's eyeglasses which he had found on one of the end tables and a number of photographs taken by him of the premises, including pictures showing a number of empty whiskey bottles.

The defense's theory of the causation of the fire was offered in part by Edward A. Warham, a consulting electrical engineer, who had visited the site for the first time on February 13, 1973; his testimony was based upon that physical inspection as well as upon his analysis of the photographs taken by the preceding witness, Mr. Guiffre.

Mr. Warham's opinion as to the cause of the fire above the door was expressed as follows:

"A  Well, it appears to me, I believe there was, that the cable was either damaged, the armoured cable, the non-metal like sheath cable was either damaged or had a nail through it at the time of installation; that over the period of time this could have gradually worked to the point where it became in contact with the sheet metal duct and we had a high

> resistive path to ground and a small current flow, but, nevertheless, heat buildup, a heat buildup enough so that we had a gradual, a beginning of smoldering, burning, and then the fire actually starting and developing from thereon."

As to the period of time that would be involved in the "build-up" to which he referred, Mr. Warham testified that "it could have extended over several days or months even without having any apparent noticeable effect to anything as far as electrical wiring is concerned." A heat build-up, however, over this period of time would occur. Thus it was ultimately his expert opinion that electricity as a cause of the fire could not be ruled out.

A second expert witness for the defense was Mr. Robert C. Byrus, retired Director of the Fire Service Extension Department of the University of Maryland, who had been engaged in work of fire prevention and investigation beginning in 1924. His work at the University of Maryland began in 1951, a position from which he retired in 1966. A course which he designed at the University of Maryland was set up for the education of arson inspectors.

Mr. Byrus' inspection of the burned premises took place in late December, 1972 or early in 1973 and his testimony was also based upon that inspection and on the photographs previously taken by Mr. Guiffre.

Mr. Byrus was in disagreement with Captain Mundy's opinion that the interior fire damage to the living room was caused by a flash-over. His definition of a flash-over differed from that of Captain Mundy. He defined it as a "situation where the interior of a room or a confined area is subjected to a high temperature, so that the combustible interior or the combustible components of the room release vapors and when the rate of release is such that they are super-heated, then there is almost an instantaneous involvement and the fire service refers to this as a flashover." He did not consider that the living room damage resulted from a flash-over because the ceiling showed no evidence of a complete involvement in fire and the two windows closest to the front

door were not charred to the same degree as the windows to the rear. He further testified that if there had been a flash-over in the living room, all of the interior furnishings would have undoubtedly been involved; whereas a desk and chair between that area and the front door showed no evidence of involvement. Furthermore, he considered that the fire over the door was burning long before the fire in the living room; and that if there had been a carpeting flash-over causing the fire in the back of the living room as contended by the State, "it would have involved the carpet in its entirety and not just a portion of it." Similarly, he denied that the fire above the door could have been caused by a flammable liquid being poured at its base. The reason for the latter opinion was as follows:

". . . Had there been a flammable poured at the base of the door, the door, in its entirety, probably would have been destroyed, because it does not have the same bulk in relationship to the amount of surface exposed as the two-by-sixes [above the door] did. The door is much more thinner and more flimsy and had more surface area in relationship to bulk. So it would have burned more readily than the two-by-sixes."

* * *

"Q In your opinion, do you believe that flammable liquid was poured at the base of that door and it banked up to this area?

A I find it difficult to believe, because the top of the door was completely destroyed. It was burned away, just as the two-by-sixes above the door were burned away, indicating that the heat did bank down and the upper part of the door, I believe, became involved from the fire that involved the two-by-sixes above the door. The bottom of the door was burnt, it was blackened, but it wasn't destroyed to the same degree that the upper part of the door was."

It was Mr. Byrus' expert opinion that the fire in the corner

of the living room was a fire altogether independent in origin of the fire above the front door; [10] and he would not rule out electricity as a cause of the latter fire for the reason that a short circuit could have occurred, as testified to by Mr. Warham.

It is quite apparent upon a careful review of the trial court's decision and oral opinion at the conclusion of the case, that not only the testimony of the expert witnesses but all of the evidence bearing upon the critical issue of the *corpus delicti* was carefully evaluated. The expert testimony of Captain Mundy was summarized, the court noting that in Mr. Mundy's opinion all natural sources or causes were eliminated and that in his judgment a flammable liquid had been used. Judge Meloy characterized as a "valiant attempt" the efforts of the defense to establish that the fire above the door was electrical in origin and that the cause of the living room fire, strangely coincident with the fire above the door, was the careless dropping of a cigarette by Mrs. Brown, a "careless smoker and frequent inebriant." Adverting to the medical testimony offered by the defense, the court characterized as "conjecture" the defense theory that Mrs. Brown, using a prescription drug, valium, along with alcohol, might have suffered a "brain syndrome." With respect to the theory of Mr. Byrus that the fire above the door was one of long duration, "matter of hours, perhaps days," the court found that this version of causation "did not coincide with the facts." Accordingly the court unequivocally held that the "premises No. 12305 Starlight Lane of George Brown was the subject matter of an arson and that the State has proven the *corpus delicti* with respect to the crime of arson." In so finding, the trial judge specifically recognized the court's duty at a bench trial to "pass upon the credibility of the witnesses, to reconcile conflicts in the description of events, and to draw all reasonable inferences from proven facts."

---

10. It was on this basis that counsel for appellant argued below that the fire in the living room was caused by the dropping of a cigarette by Mrs. Brown in a state of intoxication, and that this coincided with the electrical fire in the front door area.

As previously indicated the trial court also carefully considered the matter of criminal agency, stating at length upon the record its reasons for reaching an affirmative finding upon the voluntariness of appellant's incriminatory statements. Regarding the substantive weight of those statements the court stated its conclusion that after analysis of the evidence "the hypothetical characterization became categorical. . . ." We cannot say he erred in this conclusion. Appellant's admissions were not isolated nor incidental; taken as a whole they constituted a confession of guilt. That **he couched them, to a considerable extent, in the language of could-have or make-believe is ultimately without** significance; he was not, on this record, coerced or inveigled to "pretend" to confess; and it is apparent that the trial court rejected expert testimony, adduced by the defense, that his confession, oblique and muted as it was, reflected a childhood compulsion to confess to acts he did not commit.[11]

The court found, in addition, evidence *aliunde* of appellant's criminal agency. Here, it pointed to the proximity of the accused at the time and at the place of burning; appellant himself testified that he arrived home about 1:00 a.m., which was corroborated by the testimony of his companion that appellant had been driven home at approximately 1:00 a.m. and he had last seen appellant when he was on his porch. The trial court stated: "We have proximity, we have time, and we have place."

As a reviewing Court, upon the law and the evidence, we are bound by the provisions of Maryland Rule 1086 which mandates that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." As Chief Judge Orth

---

11. Gerald Mark Polin, a psychiatrist called by the defense, testified that appellant had been a "hyperactive child" who still showed some of the personality characteristics and emotional sequelae of that type child. Such children "tend to feel they're on a stage, and the world is their audience"; they tend to be "somewhat grandiose," and "to bring a penance on their head, as it were, because of guilt locked away from earlier times in their life." These tendencies, still present in appellant "to some extent," "could have" come forward under proper circumstances so that "some of his judgment might be suspended."

emphasized in *Nichols v. State*, 5 Md. App. 340, 247 A. 2d 722 (1968), at 352:

> "Our function is not to determine whether we would have come to a different conclusion from that of the lower court nor need we be convinced beyond a reasonable doubt of the appellant's guilt; we determine whether the lower court was clearly wrong in reaching a verdict of guilty on the evidence."

In the case at bar we do not find that the judgment of the trial court was clearly erroneous. Substantial evidence and rational inferences therefrom support a finding of the *corpus delicti* and the criminal agency of the appellant and we may not set the judgment aside.

The arguments conscientiously advanced on behalf of the appellant, and ably presented in brief and oral argument, go to the weight of the evidence and the credibility of the witnesses, matters which do not enter into the determination of the legal sufficiency of the evidence.

*Judgments affirmed.*