REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 651

September Term, 2012

DEANDRE RICARDO WILLIAMS

v.

STATE OF MARYLAND

Woodward,
Zarnoch,
Rodowsky, Lawrence F.
       (Retired, Specially Assigned),

JJ.

Opinion by Woodward, J.

Filed: October 1, 2014

On March 30, 2011, DeAndre Ricardo Williams, appellant, was arrested in Washington, D.C. concerning a fatal shooting in the College Park area in January 2011. After arriving at the homicide unit in a District of Columbia police station, appellant was charged and then placed into an interrogation room, along with two Prince George's County police officers, Detective Harris[1] and Sergeant Gregory McDonald. Immediately prior to being advised of his *Miranda* rights, appellant made the comment, "I don't want to say nothing. I don't know, —". The police then gave appellant his *Miranda* rights, after which he confessed to shooting the victim.

Appellant's subsequent motion to suppress his confession was denied by the Circuit Court for Prince George's County. Thereafter, appellant and the State agreed to proceed via a not guilty plea on an agreed statement of facts. The court convicted appellant of first degree murder and use of a handgun in the commission of a crime of violence.[2] Appellant was sentenced to life imprisonment, with all but forty-nine years suspended for first degree murder, and a concurrent twenty years' incarceration for use of a handgun in the commission of a crime of violence.

On appeal to this Court, appellant presents two questions for our review, which we

---

[1] Detective Harris's first name does not appear either in the record or in the parties' briefs.

[2] The State placed all remaining charges against appellant on the stet docket. These other charges are not relevant to the instant appeal.

have combined into one:[3]

> Did the suppression court err by denying appellant's motion to suppress the inculpatory statement that he made to the police?

For the reasons we shall explain, we answer this question "no" and, therefore, we affirm the judgments of the circuit court.

## BACKGROUND

### The Underlying Incident

For context to our review of the suppression hearing and the trial court's ruling, we shall summarize the agreed statement of facts presented to the circuit court on February 10, 2012, when appellant entered his not guilty plea.

On or about January 10, 2011, appellant and Stephan Weaver[4] agreed to rob Justin DeSha-Overcash of marijuana and money, at gunpoint. The next day, Weaver picked up appellant at a Super Fresh Market in the Glendale area and drove to 38th Avenue in College

---

[3] The questions posed in appellant's brief are:

> 1. Did police violate [appellant's] right to remain silent during a custodial interrogation when he said, "I don't want to say nothing. I don't know, —" to which the police responded "But you don't have to say nothing" but continued with the interrogation?
>
> 2. Was [appellant's] confession involuntary under Maryland common law because the police implied that [appellant] might see outside again if he confessed to a robbery gone bad instead of a premeditated murder?

[4] Weaver was a co-defendant with appellant before the trial court. He is not, however, a party to the instant appeal.

2

Park. After Weaver parked across the street from the house where DeSha-Overcash was living, appellant got out of the car alone and put on a ski mask. Brandishing a black ten-millimeter handgun, appellant entered the residence at 8809 38th Avenue and announced a robbery.

Inside the house, a physical struggle ensued between DeSha-Overcash and appellant. DeSha-Overcash resisted the robbery by throwing a glass jar at appellant's head. When the two of them struggled for the gun, appellant shot DeSha-Overcash. Appellant fled the house and ran back to the car where Weaver was waiting. As Weaver drove off, his car was captured by a speed camera fleeing from the scene.

Inside the car, Weaver asked appellant what happened. Appellant told Weaver that he shot "him," meaning the victim, "down low." Appellant later told the police that he eventually threw the gun that he used during the shooting into the Anacostia River.

During the subsequent investigation, the police recovered three fired ten-millimeter cartridge casings from the scene of the incident, all of which were determined to have been fired from the same unknown firearm. However, no physical evidence recovered from the scene of the incident was ever linked to appellant.

Additionally, an autopsy of Justin DeSha-Overcash was conducted by Dr. Russell Alexander of the Office of the Chief Medical Examiner in Baltimore. As part of the autopsy, Dr. Alexander recovered a ten-millimeter bullet, as well as a base jacket fragment from a fired ten-millimeter bullet, from the victim's abdomen. Dr. Alexander determined that the

3

cause of death was multiple gunshot wounds to the abdomen and that the manner of death was homicide.

On March 26, 2011, the police arrested Weaver. After being advised of his rights, Weaver confessed to conspiring with appellant to rob the victim at gunpoint by helping to orchestrate the attempted armed robbery.

## Appellant's Police Interview

On March 30, 2011, appellant was brought in for questioning at the District of Columbia homicide unit. Prior to being questioned by Detective Harris and Sergeant McDonald, appellant was charged with twelve criminal offenses, including first degree murder and use of a handgun in the commission of a crime of violence. The interview took place in an interrogation room and was videotaped by a single camera placed in a corner of the room. It is undisputed that appellant was in police custody at the time of his being questioned.

Appellant admitted during his interview that he entered the house and eventually shot the victim during an attempted robbery. According to appellant, the victim "rushed [him]," at which point appellant "whipped the gun out." During the ensuing struggle, appellant explained, he shot the victim twice.

## The Suppression Hearing

Appellant subsequently moved to suppress his inculpatory statements, arguing that he had unambiguously invoked his *Miranda* right to silence. On December 14, 2011, the circuit

4

court ("the suppression court") held a hearing on appellant's motion to suppress. The DVD containing the interview, and a written transcript of the interview, were admitted into evidence as joint exhibits. At the hearing, appellant testified about his questioning by the police. Neither Detective Harris nor Sergeant McDonald testified at the hearing.

According to the DVD, which the suppression court viewed, and the transcript of the interview, Detective Harris began the interview by asking appellant several ministerial, "icebreaker" questions concerning his address, contact information, and educational background. Appellant stated, among other things, that he had worked "[o]n and off" for Safeway for the past six or seven years, and that he attended college for two years on a football scholarship. The interview proceeded as follows:

<blockquote>

DETECTIVE HARRIS: (Inaudible). Heard you was fast as lightning. Lightning. Okay. The reason why me and Sergeant McDonald are here, we are investigating an incident that happened in January. We been working nonstop on it. Through our investigation your name came up, okay?

[APPELLANT]: Uh-huh.

DETECTIVE HARRIS: **Now, what we have now are what other people have been saying about it. It was enough for us to get an arrest warrant for you, okay? What we'd like to do is give you an opportunity to answer any questions that we may have, or ask us any**

</blockquote>

5

**questions that you have about the incident. We want to ask you questions. You can stop answering at any time. You don't have to talk to us. We want you to talk to us, to be honest with you. Like I say, it's your prerogative.** Like I said, you can talk to us about anything. If you are wondering what we may have to say, this is your opportunity to say, okay.

[APPELLANT]:                What's the incident?

DETECTIVE HARRIS:    Huh?

[APPELLANT]:                I said what's the incident?

DETECTIVE HARRIS:    What's the answer to what?

[APPELLANT]:                I said what's the incident?

DETECTIVE HARRIS:    Well, we'll get into it after I, **if you want to know about it, if you want to know what we're talking about, I'm going to have to read you your rights. You have the right to talk to us, you have the right not to talk to us. You have the right to talk to us and stop talking at any time. You understand that?** Like I said, we'd like to lay everything out for you and then sit back and listen to what you have to say. We'll listen to anything that you have to say. Anything. You can dispute anything that we might say, and then we'll listen to you.

6

You understand that? Okay.

Like I said, all we have at this point is what we've heard up to this point. We would love to hear from you. You understand? We're fair. You've probably got two of the fairest people at the Homicide Unit talking to you right now, okay? Like I said, that's your prerogative. **Like I said, we'd love to lay it out and get you to talk to us, but like I said, you don't have to. But we would love for you to talk to us**, and we can stop so you can see exactly where we're coming from and go from there.

Is that something you'd like to do?

[APPELLANT]: **I don't even know what's going on. That's why I ask you what's the incident.**

DETECTIVE HARRIS: **That's what I said. I can read you your rights. Like I said, after that, we can talk. Like I said, if you don't like what I'm saying you ain't got to say nothing.**

[APPELLANT]: I don't know what's going on, so I—

DETECTIVE HARRIS: Okay. **This incident happened January in College Park. Through our investigation your name came up.** Like I said, this is your opportunity to say, yeah,

7

you were involved or no, you weren't involved.

[APPELLANT]: **I don't know anything about what you all are talking about.**

SERGEANT MCDONALD: **Well, we can get to that. We got to go over your, your rights, first.**

[APPELLANT]: **I know. I still, I don't know what**,—

SERGEANT MCDONALD: **I understand that. I understand that. But we got to go through the process.** Before we can ask you were you involved, we got to,—

DETECTIVE HARRIS: We got stuff we got to take care of before we,—

**[APPELLANT]:** **Yeah, I understand that. I still don't know**,—

SERGEANT MCDONALD: I understand that. But we still got to go through the process, though. You know. We want to talk to you, but we got to go through the process.

DETECTIVE HARRIS: We want to lay everything out to you, but you have to agree to, you want to at least hear what we have to say, and that's fine. But you say you don't, **once we read you your rights, if you don't have nothing to do with it, then we just get up and roll. But we can't get into it until we get**

|  | through that. That's all I'm saying. |
|---|---|
|  | So if you're sitting here and wondering why you're here, we, we're ready to tell you why you are here. |
| [APPELLANT]: | We already know but it's so, you all sound, **it sounds so confusing. I don't know**— |
| SERGEANT MCDONALD: | It's not confusing. Let me break it down to you like this right here. You be, you watch T.V., right? Do you see when the police walk up to somebody, and we want to ask you, **we want to talk to you about something, we always read the person their rights? You've seen that on T.V., right?** They say, you've got the right to remain silent. Anything you say can and will be used against you in court. You've heard that before, haven't you? Yeah. **We have to go through that formality to get to what we want to talk about. That's, we have to go through that formality.** |
| [APPELLANT]: | **<u>I don't want to say nothing. I don't know,</u>**— |
| SERGEANT MCDONALD: | **<u>But you don't have to say nothing.</u>** |
| [APPELLANT]: | **<u>Yeah.</u>** |

**SERGEANT MCDONALD:** <u>**You don't have to say nothing.**</u> That's you know, <u>**that's your right.**</u> **But to get to one point, from point A to point B, we have to read you your rights.** And the key word is, they're your rights. So we got to read them to you, so you understand.

(Emphasis added). The DVD of the interview reveals that Sergeant McDonald raised his hands and interrupted the end of appellant's sentence as appellant was saying, "I don't want to say nothing. I don't know,—"[5]

Shortly after the excerpted portion above, Detective Harris read appellant his *Miranda* rights. The detective then asked appellant, "would you like to make a statement or would you like to talk about why we are here, without a lawyer?" As the DVD shows, appellant nodded his head silently up and down, signaling "yes." Detective Harris then asked appellant if he had been promised anything, "offered any kind of reward or benefit, or . . . threatened in any way in order to get [him] to make a statement?" The DVD depicts appellant shaking his head from left to right, signaling "no." Detective Harris then pulled out a standard Prince George's County Advice of Rights and Waiver form ("P.G.C. Form 2628"), signed his initials next to each paragraph, and gave the form to appellant. Appellant was then asked to read aloud a portion of the form in order to prove that he could read English, and he did so successfully. At Detective Harris's request, appellant proceeded to read over the form and

---

[5] This Court has reviewed the DVD of the interview.

10

signed his initials next to each paragraph. During the course of the interview, appellant made the following statement:

> [APPELLANT]: I'm going to tell you all.
>
> DETECTIVE HARRIS: What happened?
>
> [APPELLANT]: I'm going in the joint and shit. I'm [sic] didn't even have a mother fucking gun out, or no shit like that. So, like you said, somebody came in the house. But at this point, there still wasn't no mother fucking gun or nothing like that. The dude rushed me and shit. So I whipped the gun out and shit. He tried to take the mother fucking gun. So, I shoot the gun, but I don't want to shoot him. He's still trying to take the mother fucking gun. Boom. I shoot the gun again. Then after that, I don't know where the fuck I shot, but I didn't want to hit him or nothing, no way. I just was trying to get him off me and shit, because he was on me and shit, and then that was that.

Following the evidence and argument by counsel for both parties, the suppression court denied appellant's motion, stating:

> This Court has had an opportunity to review the motion, the opposition, the transcript, the DVD, the evidence admitted, as well as the testimony and the arguments.
>
> The [appellant's] prior statement, of course, whether inculpatory or falsely exculpatory, cannot be admitted unless it was elicited in compliance with Miranda procedural safeguards, was voluntarily made under Maryland common law, Maryland constitutional law and the federal constitutional law and did not violate the [appellant's] right to counsel.

11

The State must prove by a preponderance of the evidence that [appellant] has been warned adequately and weighed the privilege against self-incrimination knowingly and intelligently under the totality of the circumstances. The Court must consider the [appellant's] age, and in this case, it's 23 at the time of the statement. Intelligence; in this case, [appellant] testified that he was a sophomore in college. Experience; the experience of [appellant] is that he's had six to seven prior offenses so that he has both pled before the court and he has experience with the criminal court. Mental capacity; in this situation, there's no indication that there's any mental incapacity on the part of [appellant] to the contrary. He testified that he believes himself to be an intelligent person. The interrogation which I will get to shortly; duration, tactics and inducements to confess among the various issues.

**In this case, two different issues were raised. One, the issue of the Miranda Waiver, and the second, the voluntariness of the subsequent confession. The Court notes that at issue in particular is the expression by [appellant] on page 11 of the transcript after [appellant], Sergeant McDonald and Detective Harris had had some lay discussion regarding Miranda Rights. That [appellant] then said, "I don't want to say nothing. I don't know."**

**This Court finds the I don't know, as the State indicated, to render what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement. Thereafter, Sergeant McDonald says, but you don't have to say nothing. [Appellant] says, yeah. Then Sergeant McDonald again says, you don't have to say nothing. That, you know, that's your right. And they continue to talk about it** and, again, in more or less a lay manner after which [appellant] says, hold on, I'd like to know what's going on. So if you all got to read me my rights, then go ahead. **Where after, the Advice of Rights were presented to [appellant].**

Detective Harris went over the Advice of Rights with [appellant]. He asked at this point, would you like to make a statement or would you like to talk about why we are here without a lawyer, and [appellant] nodded his head yes. He then went on to say, have you been promised anything, have you been offered anything,

12

any kind of reward or benefit or have you been threatened in any way in order to get you to make a statement, have I threatened you, has he threatened you, and [appellant] shook his head no.  The Advice of Rights went on.

The detective asked [appellant] if he could read, but didn't take his word for it.  He actually had him read something out loud to make sure that he wasn't just asserting that he was intelligent and literate, but that indeed he was literate, and then gave it to [appellant] to read.

**In observing the DVD, one notes that [appellant] did not just take the form and sign it as one often does when one gets a contract, but rather actually took his time and read over the Advice of Rights which he did then sign.  Accordingly, this Court does not find the claim, vis-a-vis the Miranda Rights, to be a valid claim and finds the State has met its burden as regards to that claim.**

**The second issue is the issue of whether or not the actual confessions were coerced and whether they were truly, voluntarily and intelligently made.**  A review of the DVD indicated that the interrogation was certainly not a long prolonged interrogation.  [Appellant] was not cuffed.  There was no allegations of any physical coercion, and the interaction between [appellant], Sergeant McDonald and Detective Harris was indeed cordial.  To be sure, the detectives distinguished premeditated murder and a robbery gone bad.  However, [appellant's] refusal to acknowledge on the stand that the gone bad part of the robbery gone bad was a shooting of the victim flies in the face of the DVD and the transcript and is simply not credible.

The officers in this matter clearly employed trickery regarding the DNA and fingerprinting, yet such trickery is permissible.[6]  The question is whether [appellant's] statements were coerced or

---

[6] Appellant makes no argument in his brief that the officers' references to finding his DNA and fingerprints at the scene of the crime was improperly deceptive.  We note that the police "are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime."  *Ball v. State,* 347 Md. 156, 178 (1997), *cert. denied*, 522 U.S. 1082 (1998).

compelled or whether they were freely, voluntarily made.

The Court agrees with the State that [appellant] was well aware that not only did he have an option not to speak, but that he had repeatedly been advised that he could stop speaking at any time even if he had started to speak. The Court further finds that the [appellant's] statements during the interrogation, including that on Page 36, no matter what you all find out, they're going to smoke my boots anyway, and that which is found on Page 46 of the transcript, I mean, am I ever going to see the street again, do you all know, indicate that he did not have the misunderstanding that he now alleges.

**Considering the totality of the circumstances, this Court does not find that the [appellant's] decision to give a statement was the product of physical or psychological coercion, nor that the officer's conduct in this case overbore his will to resist or otherwise brought about a statement not freely self-determined by [appellant]. Accordingly, the Court finds that the State has met its burden of proof, and the motion to suppress will be denied.**

(Emphases added).

### Disposition of Appellant's Criminal Proceedings

On February 10, 2012, the parties proceeded before the circuit court on an agreed statement of facts, with appellant entering a plea of not guilty. The court found appellant guilty of first degree murder and use of a handgun in the commission of a crime of violence. At sentencing on April 25, 2012, the court imposed on appellant a life sentence, with all but forty-nine years suspended for first degree murder, and a concurrent twenty years' incarceration for use of a handgun in the commission of a crime of violence.

This timely appeal followed. Additional facts will be set forth below as necessary to resolve the issues presented.

14

## DISCUSSION

In Maryland, the overarching law regarding the use of a criminal defendant's confession against him is clear.

> The introduction of a confession as evidence against an accused at trial is permitted only after it is determined that the confession was (1) "voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda*."

*Costley v. State*, 175 Md. App. 90, 105-06 (2007) (quoting *Winder v. State*, 362 Md. 275, 305-06 (2001)). Thus, a confession must clear all three hurdles before its use as evidence against a criminal defendant is permitted.

In the case *sub judice*, appellant does not challenge the voluntariness of his confession under the second avenue—namely, that his confession was obtained in violation of the United States Constitution or the Maryland Declaration of Rights. Rather, he limits himself before this Court to two arguments: (i) the officers failed to comply with *Miranda*'s requirements; and (ii) the confession was obtained involuntarily under Maryland nonconstitutional law as the result of improper police inducement. Therefore, we will conduct our review accordingly. *See* Md. Rule 8-504(a)(6) (requiring a party's brief to contain argument in support of its position on each issue).

The suppression court's ruling denying appellant's motion to suppress is reviewable

15

in this appeal of his convictions. Md. Rule 4-252(h)(2)(C). "When reviewing a court's ruling on a suppression motion, we are constrained to rely solely on what was before the suppression court." *Ballard v. State*, 420 Md. 480, 484 n.3 (2011). Specifically,

> we consider only those relevant facts produced at the suppression hearing that are most favorable to the State as the prevailing party on the motion. While we accept the factual findings of the trial court, unless those findings are clearly erroneous, we make our own independent constitutional appraisal as to whether an action was proper by reviewing the law and applying it to the facts of the case.

*Wimbish v. State*, 201 Md. App. 239, 249 (2011) (citations and quotations omitted), *cert. denied*, 424 Md. 293 (2012).

### 1. Invocation of the Right to Silence

The Fifth Amendment to the Constitution of the United States provides that, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court explained that the "privilege against self-incrimination" embodied in the Fifth Amendment applies to individuals who are subjected to custodial interrogation by law enforcement officials. 384 U.S. 436, 467 (1966). "One of the Court's stated aims in establishing the *Miranda* rule is to 'assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'" *Lee v. State*, 418 Md. 136, 149 (2011) (quoting *Miranda*, 384 U.S. at 469). In order to combat the "inherently compelling pressures" of custodial interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," any person taken into custody must receive the benefit

16

of certain widely familiar procedural safeguards:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 467, 479.

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* at 479. However, "'[t]he rights expressed in the *Miranda* warning pertain throughout the interrogation.'" *Ballard*, 420 Md. at 488 (quoting *Lee*, 418 Md. at 150). Any and all requests by the person being questioned to exercise his or her *Miranda* right to silence must be "scrupulously honored" by police, and have the effect of "cut[ting] off questioning." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). Stated another way, if "the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010).[7]

---

[7] There is not a *per se* bar, however, to subsequent police questioning following an invocation of the right to silence. A "defendant's invocation of his right to remain silent does not preclude later questioning for an indefinite period." *Costley v. State*, 175 Md. App. 90, 107 (2007) (citing *Michigan v. Mosley*, 423 U.S. 96, 102-03 (1975)). At the very least, however, police must "suspend[] questioning entirely for a significant period" of time before reinitiating an interrogation. *Mosley*, 423 U.S. at 107.

There is likewise no *Miranda* violation where the person being questioned voluntarily reinitiates the interview with the police. *See* 384 U.S. at 478. Further, even where there *is* a *Miranda* violation, the law "does not preclude a later voluntary confession by a defendant." *Costley*, 175 Md. App. at 109.

17

Before we reach the question of whether the interrogation of appellant by Detective.

Harris and Sergeant McDonald should have ceased, we must first analyze the foundational

question of whether *Miranda* applies to this case.

*A. Was Appellant's Comment Made in the Context of Custodial Interrogation?*

As we noted in *Hoerauf v. State*,

> It is well established that *Miranda* warnings are not required in
> the absence of interrogation. Interrogation under *Miranda* refers to
> any words or actions on the part of the police (other than those
> normally attendant to arrest and custody) that the police should know
> are reasonably likely to elicit an incriminating response. An
> incriminating response is one whether inculpatory or
> exculpatory—that the prosecution may seek to introduce at trial.

178 Md. App. 292, 309 (2008) (citations and internal quotation marks omitted). Thus,

"[w]ithout the presence of both custody *and* interrogation, the police are not bound to deliver

*Miranda* warnings and obtain a proper waiver of the rights to silence and counsel before

questioning a suspect." *Cooper v. State*, 163 Md. App. 70, 93 (2005) (emphasis in original);

*see also In re Darryl P.*, 211 Md. App. 112, 154 (2013) (noting that *Miranda* rights attach

"only in the special circumstance of custodial interrogation, the critical circumstance which

the Supreme Court deems to be inherently coercive or compelling").

As this Court has recognized, it is "[t]he 'inherent compulsion' that is brought about

by the combination of custody and interrogation [that] is crucial for the attachment of

*Miranda*." *Marr v. State*, 134 Md. App. 152, 173 (2000) (citation omitted), *cert. denied*, 362

Md. 623 (2001). Indeed, in *Marr*, a case discussing whether a person being questioned may

18

"anticipatorily invoke" his *Miranda* right to counsel, we adopted the following language

from the Supreme Court's opinion in *McNeil v. Wisconsin*, 501 U.S. 171 (1991):

> "*We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation'*—which a preliminary hearing will not always, or even usually, involve. If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. *The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.*"

*Marr*, 134 Md. App. at 174-75 (quoting *McNeil*, 501 U.S. at 183 n.3) (italics added in *Marr*).

In the case *sub judice*, it is undisputed that appellant was in custody at the time he

commented, "I don't want to say nothing, I don't know,—". The parties do dispute,

however, whether appellant's statement was made "in the context of custodial interrogation."

The State argues that appellant's "comment to police, 'I don't want to say nothing. I

don't know,—' was not an invocation of his right to silence, because the statement was made

before he was advised of his *Miranda* rights and was not in response to custodial

interrogation." Relying on *Marr* and *Costley*, the State asserts that appellant's *Miranda*

rights had not yet attached. Specifically, the State argues that appellant was not yet subject

to interrogation and had not been fully *Mirandized*. Therefore, the State concludes that

"[appellant's] comment was not an invocation of his *Miranda* right to remain silent, and the

officers were free to subsequently obtain his valid *Miranda* waiver and question him."

19

Appellant argues, in response, that, under the circumstances, his comment to Detective Harris and Sergeant McDonald was made in "the context of an imminent custodial interrogation," and thus was a proper invocation of his right to silence.

In *Marr*, the suspect was arrested and, after being brought to the police department and placed in an interrogation room, gave a statement to officers after having been given his *Miranda* rights and waived the same. 134 Md. App. at 159-60. Sixteen days before the suspect gave his statement, however, the suspect's attorney, who had represented him previously in other matters, called the police on his initiative and "made it clear to [a police detective] that [the suspect] did not want to talk to police officers without [the attorney] being present." *Id.* at 158. The attorney subsequently faxed a letter to the detective confirming the conversation and repeating in writing that the suspect would not speak to officers without the attorney present. *Id.* at 158-59. Aside from the attorney's contact, however, the suspect did not otherwise invoke his right to an attorney. *Id.* at 159-60. Instead, as previously stated, the suspect waived his *Miranda* rights and proceeded to give a statement. *Id.* After the suspect moved to suppress his statement in court, the suppression court denied the motion and found that the suspect knowingly and voluntarily waived his rights. *Id.* at 161. We affirmed. *Id.* at 177-78.

As we explained,

> "[t]he antipathy expressed in *McNeil* towards the anticipatory invocation of the *Miranda* rights is consistent with *Miranda*'s underlying principles. The *Miranda* right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to

20

> protect against—'the compelling atmosphere inherent in the process of in-custody interrogation'—and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination."

*Id*. at 177 (quoting *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir. 1994)). We noted further that "at least five federal courts of appeal subsequently have interpreted [footnote 3 of the *McNeil* opinion] to mean that an individual may not invoke the *Miranda* right to counsel before custodial interrogation has begun *or is imminent*." *Marr*, 134 Md. App. at 175 (emphasis added) (citing, e.g*., United States v. Grimes*, 142 F.3d 1342, 1347-48 (11th Cir. 1998); *United States v. LaGrone*, 43 F.3d 332, 338-39 (7th Cir. 1994) ("[I]n order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent.")). Because the suspect's purported invocation of his right to counsel occurred prior to his being in custody, we held that the anticipatory invocation was invalid under our reading of *Miranda* and its progeny. *Marr*, 134 Md. App. at 178. We did not reach the issue of "whether, in addition to custody, interrogation must be actual or at least imminent before the right to counsel can be invoked." *Id*. at 178.

In *Costley*, we revisited the issue left open by *Marr*. The suspect had been arrested by a police officer and was being transported in the front seat of the police car to a holding cell. *Costley*, 175 Md. App. at 97. While stopped at a traffic light, the officer grabbed a Maryland State Police Detention Log form on which he intended to record the suspect's personal information, such as his name, the case number, address, and social security number. *Id.* According to the officer's testimony at the suppression hearing, the officer

21

asked for the suspect's social security number. *Id.* The suspect did not acknowledge the officer's question initially. *Id.* The officer then asked again for the suspect's social security number, at which point the suspect stated, "You have my wallet, don't you?" *Id.* at 97-98. When the officer responded, "Yes, but why don't you make this easier on both of us and just give me the information I need?," the suspect responded, "I'm not telling you shit." *Id.* at 98. Later, after the suspect was placed in the holding cell, the police read him his *Miranda* rights and obtained a signed waiver form from the suspect, as well as a subsequent statement. *Id.* As in *Marr*, the suspect later moved to suppress the statement, and the circuit court denied the suspect's motion. *Id.* at 99-100. Again, we affirmed. *Id.* at 109-10.

In analyzing the suspect's claim, we noted that the custodial interrogation requirement of *Miranda* is "applicable to invocation of a suspect's right to remain silent as well as his or her right to counsel." *Id*. at 106 (citing *Marr*, 134 Md. App. at 177). We elaborated that "the language of *McNeil* suggests that custody, *absent interrogation*, is insufficient." *Costley*, 175 Md. App. at 111 (emphasis added). We stated that, under the circumstances, the suspect was not being interrogated when he said, "I'm not telling you shit," because "[t]he officer's comments might have been unwise, but the comments complained of were not questions and did not relate to the crime." *Id*. at 107. Therefore, we held that the suspect's *Miranda* rights had not attached at the time of his comment. *Id.*

We analyzed the issue of whether the invocation of the right to counsel was made in the context of interrogation after the suspect was taken into custody in *Hoerauf*, 178 Md.

22

App. At 307. In *Hoerauf*, patrol officers arrested the suspect and brought him to the police station. *Id.* at 299. After arriving at the police station, the suspect was handcuffed to a table and fingerprinted, then placed in a holding cell, where he remained for several hours. *Id.* at 304. The suspect testified at the suppression hearing that, while in the holding cell, he requested several times to call his mother, an attorney. *Id.* at 304-05. The suspect was subsequently brought into an interrogation room and subjected to questioning by a police detective. *Id.* at 299, 300 n.5. At the suppression hearing, the detective testified that the suspect "did not want an attorney" while being questioned in the interrogation room. *Id.* at 303. Furthermore, the suspect himself did not remember whether he requested to speak to his mother or otherwise requested an attorney while inside the interrogation room. *Id.* at 305. The suppression court denied the suspect's motion. *Id.* at 312.

On appeal, we affirmed the trial court's conclusion that the suspect "did not validly invoke his Fifth Amendment right to counsel prior to giving a statement" to the police. *Id.* at 318.[8] As we explained:

> We come to the same conclusion in the case *sub judice* as we did in *Costley*. Assuming that appellant clearly expressed his desire for the assistance of counsel by repeatedly asking to talk to his mother, an attorney, **all such requests were made by appellant prior to being placed in the interrogation room and questioned by Detective Sofelkanik. As found by the trial court, and not**

[8] Although this Court ultimately reversed the judgment of the trial court in *Hoerauf v. State*, it did so for reasons unrelated to those posed by the instant appeal—namely, that the trial court abused its discretion in propounding a pattern jury instruction on flight. *See* 178 Md. App. 292, 318-28 (2008).

**disputed by appellant, at no time from his entry into the interrogation room until the completion of his statement did appellant ask to speak with his mother, or otherwise request the assistance of counsel.** Accordingly, we hold that appellant did not validly invoke his Fifth Amendment right to counsel prior to giving a statement to Detective Sofelkanik.

*Id.* at 318 (emphasis added). Stated another way, we held that, where the suspect *does not* invoke his *Miranda* right after "his entry into the interrogation room," his prior invocation *was not* valid, *i.e.*, such invocation was not made in the context of custodial interrogation. *Id.*

In the case *sub judice*, we conclude that appellant's *Miranda* rights had attached by the time that he made the critical comment to Detective Harris and Sergeant McDonald. In contrast to the suspect in *Hoerauf*, appellant's comment was made after he was placed in the interrogation room and after he began speaking with the police. Although actual interrogation had not yet commenced, because Detective Harris had only a "lay discussion" with, and asked "icebreaker" questions of, appellant up to that point, the interrogation was "imminent." *See Marr*, 134 Md. App. at 174-75. Appellant had already been arrested and had entered an interrogation room, where he remained in close physical proximity with two police officers. In addition, prior to appellant's comment, the officers told appellant at least three separate times that they would be advising appellant of his *Miranda* rights. Detective Harris explained: "You have the right to talk to us, you have the right not to talk to us. You have the right to talk to us and stop talking at any time." In short, these circumstances present the "compelling atmosphere"—and its corresponding danger of "inherent

24

compulsion"—that the *Miranda* prophylaxis was expressly designed to guard against. *Id.* at 173, 177 (citing *Alston,* 34 F.3d at 1247). Therefore, we hold that appellant's comment was made "in the context of custodial interrogation," McNeil, 501 U.S. at 182 n.3, and consequently, appellant could invoke his right to silence under *Miranda*.

Appellant was, as he argues in his brief, "in the right time and place to invoke" his *Miranda* rights and, thereby, terminate the interrogation if he so chose. *See McNeil*, 501 U.S. at 182 n.3 ("Most rights must be asserted when the government seeks to take the action they protect against."). We must now evaluate whether appellant's comment, "I don't want to say nothing. I don't know,—" was, as a matter of law, a valid invocation of his right to silence.

*B. Was Appellant's Invocation Unambiguous?*

Appellant contends that "[t]he police violated [his] right to remain silent during a custodial interrogation when [appellant] said, 'I don't want to say nothing. I don't know,—' to which the police responded 'but you don't have to say nothing' but continued with the interrogation." In support of this contention, appellant argues that he "clearly, unambiguously and unequivocally invoked his right to remain silent." Pointing to the context in which appellant's statement was made during the videotaped questioning, as well as the transcript itself, appellant claims that, "[i]t is clear from [his] body language, tone and speed and cadence of his speech that the second sentence was going to be consistent with the first sentence and that he was not equivocating." To that end, appellant asserts that "[i]t makes no sense whatsoever for [appellant] to say in the same breath, . . . I want to remain silent and

25

then I don't know." Instead, appellant claims, "[t]he only reasonable interpretation is that [appellant's] second sentence was a continuation and not a renunciation of the sentence he spoke not one second earlier."

Appellant also argues that "there is no need to speculate what a reasonable officer would have interpreted [appellant's] statement to mean," because the police officers questioning appellant clearly understood his statement as an invocation of his right to silence. In support of this claim, appellant notes that the officers " repeated back to [appellant] twice 'But you don't have to say nothing.'" Indeed, appellant asserts, Sergeant McDonald cut him off by raising both of his hands and speaking over appellant as he was saying "I don't know." From this, appellant argues that "[t]he State cannot have the police silence a criminal defendant during his attempt to invoke the right to remain silent and then claim that said defendant failed to invoke that right." Therefore, appellant claims, the police did not "scrupulously honor[]" his invocation of his right to silence, and the suppression court erred in failing to suppress his statements.

The State asserts, in response, that, "the motions court properly found that [appellant's] invocation was ambiguous and equivocal and did not preclude the officers from obtaining his *Miranda* waiver and questioning him." Specifically, the State claims that appellant's statement was "given while police were explaining the 'process' of going through his [*Miranda*] rights," and, therefore, "could be reasonably understood by the police to be a matter of [appellant] trying to decide his course of action in dealing with the police,

26

particularly in light of his subsequent advisement and waiver of those rights and his decision to speak with the police."

In denying appellant's motion on this issue at the close of the December 14 hearing, the suppression court determined that, "the I don't know, as the State indicated, [] render[s] what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement." The suppression court further concluded that, following appellant's statement, the officers properly proceeded through the Advice of Rights form with appellant before ultimately obtaining his confession. Accordingly, the court "[did] not find [appellant's] claim, vis-a-vis the Miranda Rights, to be a valid claim" and "[ruled] the State has met its burden as regards to that claim."

In *Davis v. United States*, a case involving the right to counsel, the Supreme Court explained that the

> [i]nvocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." **But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.**
>
> **Rather, the suspect must unambiguously request counsel.** As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. **If the statement fails to meet the requisite**

27

**level of clarity,** *Edwards* **[***v. Arizona***] does not require that the officers stop questioning the suspect.**

512 U.S. 452, 459 (1994) (emphasis added) (citations omitted). Furthermore, "in the absence of a clear statement . . . the police are not required to ask 'clarifying questions' as to the suspect's intended meaning." *Wimbish*, 201 Md. App. at 251.

In *Berghuis*, the Supreme Court was faced with the issue of whether a suspect's "persistent silence" in response to police questioning constituted an invocation of his right to silence. 560 U.S. at 379. After discussing the *Davis* precedent, the Court explained that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Id*. at 381.[9]

Consequently, it is the law in Maryland that a suspect in custodial interrogation must unequivocally and unambiguously invoke his or her right to silence before the police are

---

[9] In *Freeman v. State*, this Court held that, before a suspect has waived his or her *Miranda* rights, an ambiguous invocation of the right to silence restricted the police to merely asking clarifying questions. 158 Md. App. 402, 433 (2004). However, as we noted in *Wimbish v. State*, *Freeman* was decided "in the absence of any clear indication from the Supreme Court as to [the] reach" of *Davis v. United States*, 512 U.S. 452, 458 (1994). 201 Md. App. 239, 252 (2011). Thus, following *Berghuis v. Thompkins*, 560 U.S. 370 (2010), we noted that, "it appears that our holding in *Freeman* . . . is no longer viable." *Wimbish*, 201 Md. App. at 254 n.8 (citing Andrew V. Jezic, Frank Molony, William E. Nolan, & Hon. Patrick L. Woodward, *Maryland Law of Confessions* § 12:2 (2010-11 ed.)).

More recently, this Court went even further in *In re Darryl P.*, firmly declaring that, "[w]hat we earlier held, pre-*Berghuis v. Thompkins*, in *Freeman v. State*, is hereby overruled." 211 Md. App. 112, 169 (2013) (citation omitted).

To echo this Court's previous sentiments, *Freeman* is no longer good law.

required to terminate the interrogation. Furthermore, as we have noted, the *Davis* standard applies to both post-*Miranda* waiver and pre-*Miranda* waiver situations, as in the case *sub judice*. *See Wimbish*, 201 Md. App. at 253 (citing *Berghuis*, 560 U.S. at 378-82). Therefore, using an objective standard, we must evaluate whether a reasonable police officer under the circumstances present in the instant case would understand appellant's statement to be an invocation of the right to silence. *See Ballard*, 420 Md. at 490 (noting that the inquiry is objective).

As the State conceded below, the isolated statement "I don't want to say nothing" would be unambiguous. *See also People v. Arroya*, 988 P.2d 1124, 1133 (Colo. 1999) ("I don't wanna talk no more" held to be an unambiguous invocation); *Ballard*, 420 Md. at 491 ("You mind if I not say no more and just talk to an attorney about this" held to be an unambiguous invocation of suspect's right to counsel); *Law v. State*, 21 Md. App. 13, 36-37 (suspect's statement that "*he didn't want to talk anymore*" an unambiguous invocation), *cert. denied*, 272 Md. 744 (1974). We agree with the suppression court, however, that the "I don't know,—" appended to the statement, and made by appellant in the same breath as the first portion of his comment, "render[s] what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement." As a classic expression of uncertainty, "I don't know" introduced a level of doubt into the message being communicated by appellant to Detective Harris and Sergeant McDonald. Indeed, the inclusion of those three words strongly suggest that appellant himself —let alone the police

officers whom the law charges with understanding his intent—was unsure of how to proceed.[10] At most, appellant's comment suggested that he *might* want to remain silent. *See Wimbish*, 201 Md. App. at 259 ("If appellant's comment indicated that he *might* want a lawyer provided, that was not enough, under *Davis*, to require the detectives to end the interview."). Consequently, we cannot say that a reasonable police officer faced with the same circumstances would find appellant's comment an unambiguous and unequivocal invocation of the right to silence.

Furthermore, appellant's comment was more ambiguous when placed in context with the other statements that he had made in the interrogation room up to that point. Courts from other jurisdictions have concluded that a suspect's comments that "could be construed as an invocation of [the] right to remain silent" may be ambiguous after examining the circumstances under which those comments were made. *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir.), *vacated on other grounds sub nom. Mills v. United States*, 519 U.S. 990 (1996) ("I don't got nothing to say" held to be ambiguous "when considered in context"

---

[10] In addition, all of the cases that we have found analyzing comments that include the phrase "I don't know" found such comments to be ambiguous. *See Commonwealth v. Bishop*, 963 N.E.2d 88, 95 n.9 (Mass. 2012) ("I don't know what's going on. I'm getting real nervous and real scared," held to be ambiguous invocation of right to silence); *People v. Silva*, 754 P.2d 1070, 1083-84 (Cal. 1988) (continuing interrogation after suspect stated, "I don't know, I really don't want to talk about that" held not to violate *Miranda*), *cert. denied*, 488 U.S. 1019 (1989); *West v. State*, 720 S.W.2d 511, 518 (Tex. Crim. App. 1986) (en banc) ("I don't know how that bitch got killed" held not to be invocation of right to silence), *cert. denied*, 481 U.S. 1072 (1987); *cf. State v. Sabetta*, 680 A.2d 927, 932 (R.I. 1996) ("I don't want to talk about it right now" held not to be unequivocal invocation, because "the words 'right now' operated to qualify and limit" the suspect's intent).

because the comment could either be an invocation of one's right to silence or "merely an angry response to the [waiver of rights] form in front of [the suspect]"); *see also United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006) ("I'm not going to talk about nothin'" and "I'm not gonna talk about nothin'— if you'd give me a picture of what's going on, but I ain't gonna talk about shit" held to be ambiguous, because comment "is as much a taunt—even a provocation—as it is an invocation of the right to remain silent"), *cert. denied*, 549 U.S. 1230 (2007); *Burket v. Angelone*, 208 F.3d 172, 199-200 (4th Cir.) ("I just don't think that I should say anything" and "I need somebody that I can talk to" held to be ambiguous, because detective "had every reason to believe that [the suspect] wished to talk" when "considering the circumstances as a whole"), *cert. granted*, 530 U.S. 1256, *and cert. denied*, 530 U.S. 1283 (2000). In the instant case, appellant had asked Detective Harris and Sergeant McDonald three times, "What's the incident?" and, three other times, told them that he didn't know "what's going on" or "what you all are talking about." Viewed objectively, the statements made by appellant in the moments leading up to his saying, "I don't want to say nothing. I don't know,—" suggest that appellant was merely trying to ascertain from the police what was the specific incident they were investigating. We need not speculate about what appellant was actually, subjectively thinking at the time; it is enough for our purposes that, from an objective standpoint, a reasonable police officer would have believed that the comment appellant made was ambiguous.

For these reasons, we hold that appellant's comment to the police in the case *sub*

31

*judice* ("I don't want to say nothing. I don't know,—") was ambiguous, and thus the suppression court did not err when it held that appellant did not invoke his *Miranda* right to silence.[11]

## 2. Voluntariness of Appellant's Confession Under Maryland Common Law

Appellant argues that his confession was involuntary "under Maryland common law because the police implied that [he] might see outside again if he confessed to a robbery gone bad instead of a premeditated murder." Appellant further contends that the police "did more than just present [appellant] with two different characterizations of the crime at issue." Instead, appellant asserts that, through their statements, "the police made it clear that if

---

[11] We would be remiss if we did not discuss the nonverbal conduct of the police officers, as captured on the DVD. Such consideration is permissible, because it is clear from the record that the suppression court was presented with and actually watched the DVD. *See Rush v. State*, 403 Md. 68, 104 (2008) (remanding for consideration of both the interview transcript and DVD, because the "observation of [] inflections and demeanor . . . may differ from those inferences that can be drawn from the bare transcript"). As mentioned *supra*, appellant was interrupted in the midst of his statement ("I don't want to say nothing. I don't know,—") by Sergeant McDonald, who noticeably raised his hands and spoke with a forceful tone.

Nothing we state in this opinion should be read to condone police conduct, verbal or nonverbal, that seeks to prevent a suspect's invocation of his *Miranda* rights by metaphorically "put[ting] masking tape" on the suspect's mouth, as appellant argued to the suppression court. *Cf. Ballard*, 420 Md. at 489 ("[A] valid waiver 'cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation.' Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable.") (quoting *Smith v. Illinois*, 469 U.S. 91, 98-99 (1984) (per curiam) (alteration in original). However, under the totality of the circumstances in the case *sub judice*, and upon our own review of the DVD, we cannot objectively say that Sergeant McDonald's comments and conduct were so coercive that appellant was prevented, or even discouraged, from invoking his right to silence.

[appellant] confessed that he had committed the murder, but that it was a 'robbery gone bad' as opposed to a premeditated murder," he might "see outside again" or receive some other form of a less harsh sentence.

Citing *Ball v. State* and *Smith v. State*, the State responds that the police officers did not improperly induce appellant to give his confession. *Ball*, 347 Md. 156 (1997), *cert. denied,* 522 U.S. 1082 (1998); *Smith*, 20 Md. App. 577, 591, *cert. denied*, 272 Md. 748 (1974), *cert. denied*, 420 U.S. 984 (1975). The State further responds that the police merely "presented two versions of facts with respect to the shooting." Furthermore, according to the State, "[t]he police never threatened [appellant] with a longer prison sentence, or promised a lighter sentence if he confessed"; rather, "they were explaining that '[t]here were two different charges here,' explaining the differences between premeditated murder, and a possible accidental shooting during a botched robbery." The State asserts that, to the extent that the police made reference "to a longer sentence associated with [the] first-degree premeditated murder version of facts," they were merely stating "possible legal consequences of the findings of fact at trial." Nor, the State argues, did the police officers improperly promise benefits to appellant, because "any benefit to [appellant] based on the facts of the case would have nothing to do with the officer's actions." Instead, the benefit "would come from the state of the law, or a decision by a fact-finder, which is entirely out of the officer's hands."

As an appellate court, we "undertake[] a *de novo* review of the [suppression court]'s

33

ultimate determination on the issue of voluntariness." *Knight v. State*, 381 Md. 517, 535

(2004). Our review is guided by the following principles of Maryland nonconstitutional law.

"[A] confession that is preceded or accompanied by threats or a promise of advantage

will be held involuntary, notwithstanding any other factors that may suggest voluntariness,

unless the State can establish that such threats or promises in no way induced the

confession." *Hill v. State*, 418 Md. 62, 75-76 (2011). In evaluating whether a confession

was improperly induced by the police, we are guided by the two-pronged test set forth in

*Hillard v. State*, 286 Md. 145 (1979), and explained again recently by the Court of Appeals

in *Hill*:

> [A]n inculpatory statement is involuntary and must be suppressed if:
> (1) any officer or agent of the police force promises or implies to a
> suspect that he will be given special consideration from a prosecuting
> authority or some other form of assistance in exchange for the
> suspect's confession, and (2) the suspect makes a confession in
> apparent reliance on the police officer's explicit or implicit
> inducement. Both prongs of the *Hillard* test must be satisfied before
> a confession is deemed to be involuntary.
>
> **The first prong of the *Hillard* test is an objective one.** In
> other words, when determining whether a police officer's conduct
> satisfies the first prong, **the court must determine whether a
> reasonable person in the position of the accused would be moved
> to make an inculpatory statement upon hearing the officer's
> declaration**; an accused's subjective belief that he will receive a
> benefit in exchange for a confession carries no weight under this
> prong. Ultimately, the court must determine whether the interrogating
> officers or an agent of the police made a threat, promise, or
> inducement. The threat, promise, or inducement can be considered
> improper regardless whether it is express or implied.
>
> **If the suppression court finds that the law enforcement**

34

**officer improperly induced the accused, then the second prong of the *Hillard* test requires the court to determine whether the accused relied on that inducement in making the statement he or she seeks to suppress.** Specifically, the court must examine whether there exists a causal nexus between the inducement and the statement[.]

*Id.* at 76-77 (emphasis added) (citations and internal quotation marks omitted).

In denying appellant's motion on this issue, the suppression court stated:

The [] issue is . . . whether or not the actual confessions were coerced and whether they were truly, voluntarily and intelligently made. A review of the DVD indicated that the interrogation was certainly not a long prolonged interrogation. [Appellant] was not cuffed. There was no allegations of any physical coercion, and the interaction between [appellant], Sergeant McDonald and Detective Harris was indeed cordial. To be sure, the detectives distinguished premeditated murder and a robbery gone bad. However, [appellant's] refusal to acknowledge on the stand that the gone bad part of the robbery gone bad was a shooting of the victim flies in the face of the DVD and the transcript and is simply not credible.

The officers in this matter clearly employed trickery regarding the DNA and fingerprinting, yet such trickery is permissible. The question is whether [appellant's] statements were coerced or compelled or whether they were freely, voluntarily made.

The Court agrees with the State that [appellant] was well aware that not only did he have an option not to speak, but that he had repeatedly been advised that he could stop speaking at any time even if he had started to speak. The Court further finds that [appellant's] statements during the interrogation, including that on Page 36, no matter what you all find out, they're going to smoke my boots anyway, and that which is found on Page 46 of the transcript, I mean, am I ever going to see the street again, do you all know, indicate that he did not have the misunderstanding that he now alleges.

Considering the totality of the circumstances, this Court does not find that the [appellant's] decision to give a statement was the

> product of physical or psychological coercion, nor that the officer's conduct in this case overbore his will to resist or otherwise brought about a statement not freely self-determined by [appellant]. Accordingly, the Court finds that the State has met its burden of proof, and the motion to suppress will be denied.

"Those statements that have been held to be improper inducements have involved promises by the interrogating officers either to exercise their discretion or to convince the prosecutor to exercise discretion to provide some special advantage to the suspect." *Knight*, 381 Md. at 536 & n.14 (compiling a list of statements held to be improper inducements); *see also Winder*, 362 Md. at 313-14, 316 (promises of "special consideration in the prosecution of [a suspect]'s case" and implied promises of guaranteeing suspect's personal protection against acts of revenge or going to prison are improper inducements). Beyond this, though, "'[c]oercive barnacles' can take many forms and are not limited to instances in which interrogating officers promise *their* assistance to the accused." *Hill*, 418 Md. at 80 (quoting *Hillard*, 286 Md. at 150). Thus in *Hill*, the Court of Appeals held that a detective's promise (or suggestion) that the victim's family "did not want to see [the suspect] get into trouble, but they only wanted an apology" improperly implied that the family would assist the suspect in "avoid[ing] criminal charges or, at the least, lessen the likelihood of a successful criminal prosecution." 418 Md. at 79-10. Thus "special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession" is improper. *Id.* at 76.

36

On the other hand, "a promise to a suspect that the interrogator truthfully would inform the prosecutor that the suspect either did or did not cooperate is not a promise of special advantage," and, therefore, not an improper inducement. *Knight*, 381 Md. at 536. Further, "an appeal to 'the inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense.'" *Ball*, 347 Md. at 179 (quoting *Kier v. State*, 213 Md. 556, 562 (1957)); *see also Smith*, 20 Md. App. at 591 ("[A] mere exhortation to tell the truth [does] not amount to a prohibited inducement.") (citation omitted).

In the instant case, after Detective Harris and Sergeant McDonald advised appellant of his *Miranda* rights, both orally and in writing via an Advice of Rights form, appellant waived his rights and agreed to speak with the officers. As the questioning proceeded, appellant told the police that the incident "wasn't supposed to be nothing but a robbery." Detective Harris then went on at length, speaking largely uninterrupted by either appellant or Sergeant McDonald:

> At this point, we can't believe what he said because in my opinion, or in our opinion, you could have just went in there, shot the dude, took whatever he had. You have no witnesses at that point, and rolled out. But, [the driver]'s just saying that you had no intentions other than going in there.
>
> **There are two different charges here. There is a pre-meditated going in, blasting somebody away, taking their stuff and roll. That's a bad charge. We go by [the driver's] story, the fact that you went in there, he had no intentions on killing this dude. None. Stuff got out of hand**, the dude wouldn't talk, wouldn't putting up what he was saying. The dude is a big dude. You're kind of a slim dude, and he wanted to fight. He wanted to see whether or not you had balls enough to pull the trigger. Came after you, you gave

37

a warning shot. He still wouldn't listen to what you were saying, and then bam, all hell broke loose.  Glass breaking, whole nine.

**That's a different charge, okay?  All I'm saying is, I would not, if I were you, I would not want us to leave here thinking that you walked in that house, popped this dude, premeditated,** walked in there, I'm going to kill this cat, take everything in the house, and roll out. **You may never see outside again if you let us leave here thinking that.**

\* \* \*

**We're trying to figure out what happened.  Did you just go in there, cold blooded, shot that dude for no reason, or you just went in there to do what somebody did to you, just to get back on your feet and get back in the game?**  Now, like I said, you're a smart dude. You can tell if you're looking at me, I ain't playing. I'm telling you. **There's only two ways out of this thing.  That you go in there, gun that man (indiscernible), flat out no heart, cold blooded like you, like you could care less about life or you were in there just to do, and you wasn't even as violent as the person who did that to you.**

\* \* \*

We can't go by what [the driver] said why you were there or what happened, because they may be trying to cover up, you know, make it look good for you.  Maybe they're trying to help you out. Hey man, he didn't mean to shoot nobody.  Man, who, I'm the police. **As far as I'm concerned, you walked up in that joint with the intentions of killing that dude.**

**But I need to hear from you and figure out how sincere you are that that's not what you meant to happen.**  That's the only reason why we're here, and if we were some heartless bastards we could just, screw it, first degree murder.  He went in there.  He premeditatedly killed that dude, and that's it.  We ain't taking no deals.  We're walking out the door.  We ain't even talking to you. Send you straight to jail.  I mean, if that's the way, I mean, but we're not like that.  **We, we want to give people opportunities.**

38

You're another black guy.  You're still young, and **I want to make sure that you get every opportunity to tell us the truth.  Tell us that you're not a heartless bastard and went in there and just killed that dude.  We want to know that.**

(Emphasis added).

Later in the interview, appellant expressed concern to the officers about the potential consequences of his charges, saying, "You all tell me I'm already being charged with that shit.  No matter what you all find out, they're going to smoke my boots anyway."  The officers denied that this was where things stood, and told appellant that his "statement goes a long way."  Detective Harris then informed appellant of two possible outcomes, as he saw it: "It could be as simple as a robbery gone bad, or a flat out cold blooded first degree murder.  It's as simple as that.  Robbery gone bad. First degree murder.  Prove it."  Immediately thereafter, appellant stated, "I'm going to tell you all[,]" and confessed that he shot the victim.

Appellant claims that "the implication of [what the police told him] is that if [appellant] were to confess to a robbery gone bad, the police would be able to ensure that [appellant] would 'see outside again.'"  Appellant also argues that he "was left with the idea that a deal might be offered, and that his 'boots might not be smoked' if he confessed to a robbery gone bad."  Viewing these claims objectively, we do not agree that Detective Harris's statements would cause a layperson to form such beliefs and inferences.  Thus, we conclude that there was no improper inducement made by the State in eliciting appellant's confession.

39

We find *Ball v. State* of great value in evaluating this issue. In *Ball*, the police were investigating a burglary in which the victim was fatally shot multiple times in the torso. 347 Md. at 167. Their investigation eventually led them to the appellant as a suspect, and the police brought him in for questioning. *Id.* at 167-68. After properly *Mirandizing* the appellant, the interrogating officers presented the appellant with two documents that one of the officers had prepared ahead of time. *Id.* at 168. The two documents were organized in a parallel structure, with each weaving a narrative hypothesizing about what happened during the shooting. *Id.* The first document stated that the victim was "brutally killed" in her parents' home, and that the appellant "is a cold blooded killer" who "has no regard for human life" and "would kill again because he liked it." *Id.* The second document, by comparison, painted a softer portrait of the incident. *Id.* at 169. In this version, the victim was "accidentally killed," and the appellant "has had a tough life," and "didn't want to" kill the victim, but did so during a struggle with the victim and "because he was afraid she could identify him." *Id.* One of the detectives testified that, after reading the documents, the appellant asked him, "what do they do for me." *Id.* The detective explained to the appellant that the documents "were two different ways of characterizing [the appellant]." *Id.* After further discussion between the appellant and the police, the appellant orally confessed to killing the victim and then provided a written confession. *Id.* at 170, 172. Before trial, the circuit court denied the appellant's motion to suppress both the oral and written statements. *Id.* at 172. Subsequently, the suspect was convicted of first degree murder and sentenced to

death.  *Id.* at 172-73.

The Court of Appeals affirmed the conviction.  *Id.* at 207.  Recognizing that "deception short of an overbearing inducement is a valid weapon of the police arsenal," the Court noted that the police "are permitted to trick the suspect into making an inculpatory statement." *Id.* at 178-79 (citations and internal quotation marks omitted).  The trickery used by the police was that both documents presented fact patterns that supported first degree murder convictions, albeit under different theories—namely, first degree premeditated murder and felony murder, respectively. *See id.* at 180.  The Court then determined that the record did not support the appellant's assertion that the police somehow took advantage of his ignorance.  *Id.*  Instead, the Court explained, "deception short of an overbearing inducement is a valid weapon of the police arsenal," and  "[s]imilarly, an appeal to the inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense."  *Id.* at 178-79.  Therefore, the Court concluded that the appellant's confession was not rendered involuntary.

The case before us is strikingly similar to *Ball*.  Here, Detective Harris stated (albeit more explicitly than the officer in *Ball*) that there were "two different charges": "a premeditated" murder that revealed appellant to have "flat out no heart" and be "cold blooded like [he] . . . could care less about life," and "shot that dude for no reason," *or* an accidental killing in which appellant went to rob the victim's house with "no intentions on killing this dude."  In the latter version, appellant went in "just to get back on [his] feet and get back in

41

the game," *i.e.*, obtain enough drugs to viably deal them to others for his financial well-being, but encountered "a big dude" who "wanted to fight" and came after him such that "all hell broke loose." What the officers did not tell appellant was that, regardless of whether the scenario was a "robbery gone bad" or "a flat out cold blooded first degree murder," appellant would, just like the suspect in *Ball*, face the identical criminal penalty (a conviction of first degree murder), albeit on different theories (first degree premeditated murder versus felony murder). Such conduct does not constitute an improper inducement under Maryland law. *See id.* at 176.

In addition, we conclude that neither officer promised or even suggested that either they or someone else involved in the case would assist in obtaining a more favorable prosecutorial outcome for appellant. Although Detective Harris told appellant that he "may never see outside again" if the officers were left with the impression that appellant was guilty of premeditated first degree murder, Detective Harris did not give any indication that he would obtain special consideration from the court or the prosecutor on appellant's behalf. *See Hill*, 418 Md. at 76. *Compare Winder*, 362 Md. at 314 (finding improper inducement where the police told the suspect, among other things, that they were "not interested in sending [him] to jail for the rest of [his] life," and repeatedly promised to get "help" for the suspect, both from the police themselves and from the State's Attorney's Office). Instead, Detective Harris was merely advising appellant of the *possible* legal consequences of a verdict of first degree premeditated murder at appellant's future trial.

42

Detective Harris further explained during his lengthy comment to appellant that he wanted to ensure that appellant "get every opportunity to tell us the truth." This latter entreaty to appellant's sense of conscience was among the last words appellant heard before confessing to killing the victim. Such appeals to conscience are plainly permissible under our case law. *See Kier*, 213 Md. at 562.

Finally, appellant's statement that the police (and, by proxy, the State) were "going to smoke [his] boots anyway," followed by the officers' denial of that assertion, along with the suggestion to appellant that his "statement goes a long way," did not constitute an improper promise or inducement by the police. Again, neither officer indicated that he would help appellant with the prosecutor or the court in exchange for his confession. Moreover, encouraging a suspect to adopt a version of the facts that might mitigate the punishment for the crime that the suspect committed is not an improper inducement under Maryland law. *See Smith*, 20 Md. App. at 591 (holding that a detective's statement "that the court might take into consideration a version by the accused of the fire being accidental" was not an improper inducement); *see also Merchant v. State*, 217 Md. 61, 69-70 (1958) (holding that an officer's statement that he did not know whether or not it would be "easier" on the suspect if he told the truth, but encouraged the suspect to do so regardless, did not improperly induce a confession).

Therefore, we conclude that the police did not make any improper promises or inducements to secure appellant's confession. Accordingly, appellant's confession was not

involuntary under Maryland's nonconstitutional law.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**