Dissenting opinion by McDONALD, J., which BARBERA, C.J., and ADKINS, J., join.
Under the Fifth Amendment of the United States Constitution, a suspect in a criminal case has a right to remain silent in the face of police questioning. When the suspect is in police custody, officers must advise the suspect of that right, among others, in a litany that has come to be known as the Miranda warnings, and must cease questioning if the suspect invokes the right to silence.[1]
The basic rules are straightforward. But in a particular case there may be uncertainty—as to whether the person is in custody, whether the person has invoked the right to silence, or whether the police have engaged in forbidden questioning. The case law has developed subsidiary rules for grappling with such uncertainties.[2] But it does not support finding ambiguity where there is none—even if it is tempting to do so in a case *484 where the officers are not overbearing and are simply trying to keep the prime suspect talking about his role in a horrendous crime.
The Majority opinion accurately summarizes case law concerning the invocation of the right to silence by a person in police custody, some of it dealing with ambiguous invocations of the right to silence. Much of it, however, does not apply to this case. In my view, a review of the complete transcript and video of the police interview of Mr. Williams leads inevitably to the conclusion that he unambiguously asserted his right to remain silent, and that a reasonable officer would readily comprehend that election. But the officers did not halt the interrogation and Mr. Williams ultimately made oral and written statements that were used as part of the agreed statement of facts that resulted in his conviction. I would hold that the statements should have been excluded from the prosecution’s case.[3]
As the Majority opinion notes, the critical juncture in Mr. Williams’ interrogation came when he told the detectives: “I don’t want to say nothing. I don’t know ...” In the circumstances of this interview, a reasonable police officer (which, as the Majority opinion discusses, is the relevant legal test) would understand that statement to be an invocation of the right to remain silent. Some context is helpful.
According to the video recording, Mr. Williams had been alone in the interrogation room for approximately one hour when the two police officers entered and began speaking with him. The officers first asked Mr. Williams various questions concerning his background and then began to explain their interest in what he might have to say to them. Mr. Williams stated repeatedly that “I don’t know what’s going on.” The detectives insisted that it was premature for him to respond until they “go through the process.” Sergeant McDonald then gave what amounted to a preview of the Miranda warnings.[4] *485 Mr. Williams responded “I don’t want to say nothing,” with an audible emphasis on “nothing” and appeared to be about to repeat the same sentence he had stated, in one form or another, six times in the prior two minutes—“I don’t know what’s going on”—when Sergeant McDonald waved his hands to cut him off and talked over him. It is evident from the video that Mr. Williams kept talking, but the content is indiscernible (to this ear, at least, and apparently to the official transcriber as well) as a result of the officer’s simultaneous comments. However, it seems a fair inference that Mr. Williams was simply repeating the same protestation of ignorance that he had given throughout the interview to that point.
As the State concedes, there is no ambiguity in the statement “I don’t want to say nothing” as an invocation of the right to remain silent.[5] Both detectives certainly appeared to interpret Mr. Williams’ statement as conveying that sentiment.[6] Sergeant McDonald’s immediate response was “But you don’t have to say nothing.... You don’t have to say nothing....” And, shortly thereafter, Detective Harris confirmed that “you have the right to stop answering questions at any time.” However, the officers took the position that it was premature for Mr. Williams to invoke the right to silence at *486 that point in the interview because “to get to one point, from point A to point B, we have to read you your rights.” While the officers’ subjective understandings of Mr. Williams’ statement is not legally dispositive, the officers appeared to come to the reasonable conclusion that Mr. Williams was trying to assert his right to remain silent. Essentially, the detectives were telling Mr. Williams that he could not invoke his right to silence until, as Sergeant McDonald phrased it, “we go through that formality”—i.e., reciting the full Miranda warnings.
Consistent with the apparent position of the officers, the State has argued, before the Court of Special Appeals and in its cross-petition for certiorari to us, that Mr. Williams’ Miranda rights had not yet attached at the time he made the statement in question. For the reasons explained well in the opinion of the intermediate appellate court,[7] I would reject that argument and hold that the statement was made in the context of custodial interrogation.[8] See McNeil v. Wisconsin, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (Miranda rights are to be asserted within “the context of custodial interrogation”). Hence, Mr. Williams could invoke his right to remain silent at that time. The officers’ advice to Mr. Williams that he could not assert the right to silence until they reached “point B” was simply incorrect.
Thus, because Mr. Williams’ statements would have communicated (and did communicate) to reasonable officers that he chose to say nothing, Mr. Williams effectively invoked his constitutional right to remain silent. The officers should have respected his rights and ended the interview at that time.
Chief Judge BARBERA and Judge ADKINS advise that they join this opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Michigan v. Mosley, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

. E.g., Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (a parolee who is asked by police to come to the police station and told he is not under arrest is not in custody); Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (simply remaining silent for nearly three hours, without affirmatively saying anything, is not enough to invoke the right to remain silent); Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (a conversation between officers within the hearing of a suspect while he is under arrest and being driven to the police station is not interrogation).

. I do not disagree with the Majority opinion’s analysis of the voluntariness issue.

. Sergeant McDonald stated:
*485 You be, you watch T.V., right? Do you see when the police walk up to somebody, and we want to ask you, we want to talk to you about something, we always read the person their rights? You've seen that on T.V., right? They say, you’ve got the right to remain silent. Anything you say can and will be used against you in court. You've heard that before, haven’t you? Yeah. We have to go through that formality to get to what we want to talk about. That’s, we have to go through that formality.

. This fact distinguishes this case from every case cited by the Majority opinion as an ambiguous invocation of the right to remain silent: in each ambiguous invocation cited by the Majority opinion, the suspect never made any statement that, standing alone, would be clear enough to invoke the right to remain silent. For example, "I think I’ll just quit talking,” which preceded "I don’t know” in State v. Holmes, 278 Kan. 603, 102 P.3d 406 (2004), is ambiguous even standing alone.

. Mr. Williams’ body language also supported this interpretation. He was leaning back in his chair with his hands in his pockets as if totally disengaged from the interview.

. See 219 Md.App. 295, 316-23, 100 A.3d 1208 (2014).

. The Majority opinion assumes for the sake of analysis that Miranda rights had attached at the time of Mr. Williams' statement, but does not otherwise address the issue. Majority op. at 474-75, 128 A.3d at 43.